**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:25-cv-04165

ESTATE OF MICHAEL DENNIS WROBEL, by and through its personal representative
Autumn Lachendro;
AUTUMN LACHENDRO, individually; and
C.G.W., individually, a minor, by and through their legal guardian Autumn Lachendro,

      Plaintiffs,

v.

EL PASO COUNTY, COLORADO[1];
MATTHEW J. DUNDON, TRUSTEE OF WELLPATH HOLDINGS, INC. LIQUIDATING
TRUST, as a nominal defendant;
GEORGE SANTINI, MD, in their individual capacity;
MICHELLE AVALOS, LPN, in their individual capacity;
NICOLE NORMONE, RN, in their individual capacity;
OMAR STOVALL, EMT, in their individual capacity; and
KAREN PALACIOS, EMT, in their individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiffs, by and through counsel, David A. Lane, Liana Orshan, and Madison Schaefer

of KILLMER LANE, LLP, respectfully allege for their Complaint and Jury Demand as follows:

**I.      INTRODUCTION**

    1.      In the evening of December 25, 2023, Michael Dennis ("Denny") Wrobel, an

---

[1] "El Paso County, Colorado" is the correct name of the governmental entity Defendant. There is a split of opinion among some judges in this district and elsewhere.  Some judges require that plaintiffs name the Board of County Commissioners and/or the sheriff in his/her official capacity to name a Colorado county as a Section 1983 defendant. If the Court in this matter ultimately requires Plaintiffs to name as Defendants the "Board of County Commissioners of El Paso County" and/or "Sheriff Joseph Roybal in his official capacity" to sue El Paso County, or some other entity in order to obtain municipal liability against El Paso County, Plaintiffs will substitute parties and this shall serve as notice to those putative Defendants.

inmate at El Paso County Criminal Justice Center ("CJC"), began vomiting and defecating uncontrollably. He was taken to the medical unit to be assessed, but because there were no open cells in the medical unit, he was brought to a cell where he was given a vomit bag and was left moaning in pain on the floor.

2.      Medical staff at CJC gave Mr. Wrobel two doses of methadone (to treat opiate use disorder) in less than 24 hours and in close enough proximity that Mr. Wrobel suffered methadone overdose.

3.      At or around 3:15 a.m. on December 26, 2023, Mr. Wrobel was found unresponsive and comatose in his cell and was given a dose of Narcan, which temporarily revived him. The effectiveness of the Narcan proved to CJC medical staff that Mr. Wrobel was suffering from a methadone overdose. However, despite the known and obvious need to continuously monitor Mr. Wrobel after administering Narcan to ensure he did not continue to experience symptoms of methadone overdose and/or immediately transfer Mr. Wrobel to the hospital, medical staff at CJC did neither.

4.      Mr. Wrobel also regularly took significant prescribed doses of two medications to treat diabetic neuropathy (nortriptyline and duloxetine). The interactions between these two medications, and especially in combination with methadone, pose a known risk of a dangerous heart condition. Despite this known risk, CJC medical staff never ordered ECG monitoring to ensure Mr. Wrobel was not experiencing this adverse effect.

5.      After Mr. Wrobel was brought to a cell outside of the medical unit at around 3:15 a.m., he was never evaluated again by a medical provider.

6.      At or around 7:40 a.m. on December 26, 2023, Mr. Wrobel was found dead in his cell.

7.     Mr. Wrobel's death was caused by Individual Defendants' deliberate indifference to his medical needs by recklessly providing him with an overdose of methadone, failing to adequately care for him after administering Narcan to treat the overdose, and inadequately monitoring him after prescribing medications with known risks of death when combined with each other and methadone.

8.     During Wellpath's tenure at CJC from 2020 – 2023, over twenty people died. Wellpath repeatedly demonstrated that it had no concern for the well-being of CJC inmates or inmates at other detention facilities at which it provided medical services, yet El Paso County continued to contract with Wellpath to provide medical services at CJC despite knowing Wellpath's history of medical neglect and deliberate indifference.

9.     Defendants are liable for the death of Mr. Wrobel under the Eighth Amendment to the United States Constitution based on their deliberate indifference to Mr. Wrobel's obvious and serious medical needs. Defendants are also liable for wrongful death under Colorado state tort law.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiffs' federal 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All the events alleged herein occurred within the State of Colorado, and all parties were residents of the State of Colorado at all relevant times stated herein.

### III.    PROCEDURAL HISTORY

12.     Plaintiffs sent a timely notice of claim under the Colorado Governmental Immunity Act, C.R.S. § 24-10-101 *et seq*., to El Paso County on or about June 7, 2024, providing notice of potential liability of El Paso County and its employees arising from the facts of Mr. Wrobel's death as described herein.

13.     Wellpath filed for Chapter 11 bankruptcy on November 11, 2024, in U.S. Bankruptcy Court for the Southern District of Texas. On or around May 1, 2025, the bankruptcy court confirmed and entered Wellpath's reorganization plan, which provided for the creation of a liquidating trust to administer payment on unsecured creditor claims. The reorganization plan also allowed Wellpath to continue operating and providing medical services at detention facilities throughout the country under the legal fiction that the reorganized entity was a different entity than the Wellpath that had declared bankruptcy.

14.     On or about April 7, 2025, Plaintiffs filed proofs of claim as a creditor with Wellpath's bankruptcy administrator. On or about April 17, 2025, Plaintiffs opted out of the third-party release in Wellpath's reorganization plan by submitting e-ballots online.

### IV.    PARTIES

**<u>Plaintiffs</u>**

15.     At all times relevant to the subject matter of this litigation, the decedent, Michael Dennis Wrobel, was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. At all relevant times, Autumn Lachendro was the personal representative of the Estate of Michael Dennis Wrobel.

16.     Plaintiff Autumn Lachendro was Mr. Wrobel's wife when he died. At all relevant times, Ms. Lachendro was a citizen of the United States of America and a resident of and

domiciled in the State of Colorado.

17.     Plaintiff C.G.W. brings this action by and through their parent and legal guardian, Autumn Lachendro. Plaintiff C.G.W. is a minor child of Mr. Wrobel. Plaintiff C.G.W. is a citizen of the United States and was at all relevant times a resident of and domiciled in the State of Colorado.

**Defendants**

18.     Defendant El Paso County is a political subdivision chartered under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. § 1983. Among other things, El Paso County, through the El Paso County Sheriff's Office ("EPSO"), operates the El Paso County Criminal Justice Center ("CJC"), located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906.

19.     Defendant El Paso County is responsible for the oversight, supervision, discipline, and training of the law enforcement personnel at CJC.

20.     At all relevant times, Defendant El Paso County had a nondelegable duty to provide adequate medical care to inmates and detainees at CJC. El Paso County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Wellpath LLC and its employees or contractors.

21.     Wellpath LLC ("Wellpath") was a Delaware corporation with its principal address located at 1283 Murfreesboro Road, Nashville, Tennessee, and its registered agent in Colorado was Corporate Creations Network, Inc., located at 155 E. Boardwalk # 490, Fort Collins, Colorado.

22.     Wellpath had previously been known by several other names, including at least Correct Care Solutions ("CCS"), Correctional Healthcare Companies ("CHC"), and Correctional

Healthcare Management ("CHM"). The corporate organization, leadership, and governance of Wellpath is substantially similar to that of its predecessor companies, and for all intents and purposes pertaining to this action, it is the same company.

23.     At all times relevant to the subject matter of this litigation, Wellpath contracted with El Paso County to provide medical services to inmates at CJC. At all relevant times, Wellpath was responsible for the oversight, supervision, and training of all of the medical staff at CJC, including the Individual Defendants in this matter, and for the medical care of inmates housed at CJC.

24.     At all relevant times, Wellpath was acting under color of state law and performing a central function of the state.

25.     Wellpath was a private corporation, and thus neither it nor any of its employees or contractors are entitled to any immunity under the Colorado Governmental Immunity Act on Colorado state law claims or qualified or any other immunity on the federal law claims.

26.     Defendant Matthew J. Dundon, Trustee of Wellpath Holdings, Inc. Liquidating Trust ("the Liquidating Trust"), is a necessary nominal party pursuant to Wellpath's bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas Houston Division. The Liquidating Trust is named as a nominal defendant pursuant to Plaintiffs' rights under 28 U.S.C. § 157(b)(5) to (1) recover against available third-party insurance proceeds or an unreleased Non-Debtor Defendant, and/or (2) to establish or liquidate the amount of their claim against Wellpath for distribution under the Bankruptcy Plan from the Liquidating Trust.

27.     Unless otherwise indicated specifically or by context, all references herein to "Wellpath LLC" or "Wellpath" refer to (but not exclusively) the Liquidating Trust for purposes including but not limited to enabling Plaintiffs to recover against available third-party insurance

proceeds or an unreleased Non-Debtor Defendant; to establish or liquidate the amount of their claim against Wellpath for distribution under the Bankruptcy Plan from the Liquidating Trust; and obtain discovery.

28.     Defendant Wellpath is sued vicariously for the negligence and constitutional violations of its employees and directly for its own deliberate indifference, and negligent training, staffing, and supervision of staff working at the CJC.

29.     Defendant El Paso County and Wellpath are collectively referred to herein as the "Entity Defendants."

30.     At all times relevant to the subject matter of this litigation, Defendant George Santini, MD, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a licensed physician and the Medical Director at CJC, employed or contracted by Wellpath. Dr. Santini was responsible for overseeing all medical care provided at CJC and ensuring that all medical providers at CJC were adequately trained to meet the medical needs of CJC detainees.

31.     At all times relevant to the subject matter of this litigation, Defendant Michelle Avalos, LPN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as a nurse at CJC, employed by Wellpath.

32.     At all times relevant to the subject matter of this litigation, Defendant Nicole Normore, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as a charge nurse at CJC, employed by Wellpath.

33.     At all times relevant to the subject matter of this litigation, Defendant Omar Stovall, EMT, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as an EMT at CJC, employed by Wellpath.

34.     At all times relevant to the subject matter of this litigation, Defendant Karen Palacios, EMT, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as an EMT at CJC, employed by Wellpath.

35.     Defendants Santini, Avalos, Normore, Stovall, and Palacios are collectively referred to herein as "Individual Defendants."

## V.     FACTUAL ALLEGATIONS

**Denny Wrobel was a beloved father, husband, son, and brother.**

36.     Michael Dennis ("Denny") Wrobel was only 44 years old when he died at CJC.

37.     Mr. Wrobel had successfully battled addiction when he was younger, and by the time he reconnected with his wife to-be, Autumn Lachendro, he was sober.

38.     Mr. Wrobel and Autumn, who had gone to high school together, spent many happy years together. When their daughter, C.G.W., was born in 2016, Mr. Wrobel was ecstatic.





39.      Being a parent to C.G.W. was Mr. Wrobel's greatest joy, and he was an incredible

father. C.G.W. was his entire world, and she in turn loved him endlessly.

40.    C.G.W. was only eight when Mr. Wrobel died at CJC. His absence in her life can never be filled.



41.    Mr. Wrobel's family meant everything to him, and he was its heart. He was extremely close to his mother, Linda Bastyr; father, Mark Wrobel; three siblings, Kristi Bolte, Theodore ("Ted") Wrobel, and Robert ("Rob") Wrobel; numerous nieces and nephews; and his best friends, Bobby Joslen and Alex Bolte (who was also his brother-in-law).


Mr. Wrobel with his siblings

42.    Mr. Wrobel was "Uncle Goomba" to his nieces and nephews, all of whom adored him, and he loved to spoil them at Christmas and other holidays. He made every holiday and event special for everyone.

43.    Mr. Wrobel owned a successful roofing business.

44.    Mr. Wrobel loved fast cars, soccer, and snowboarding – he used to coach snowboarding at Keystone Resort. He also always had a very special place in his heart for animals.

45.    Mr. Wrobel's charisma was unmatched. He could always make people smile, and he brought out laughter in everyone he met. He told amazing, hilarious stories. He always had the right words to say to help comfort and guide his friends and family members when times were hard. Mr. Wrobel had a huge heart, and he made the hearts of everyone he loved fuller.

46.    Several years before his death, Mr. Wrobel was prescribed Dilaudid for a medical

issue, leading him to relapse.

47.     Mr. Wrobel's loss has devastated his family. Even now, almost two years later, his parents are in shock, struggling with the unimaginable pain of losing a child. His siblings' grief is immense, and they miss him every single day.

48.     Words cannot capture how much Mr. Wrobel was loved, nor the pain his family and friends are left with now that he's gone.

**Defendants provided recklessly inadequate medical care to Mr. Wrobel, leading to his death.**

49.     After being arrested for possession of an illegal substance in September 2023, Mr. Wrobel was serving a 115-day sentence at CJC when he died. He only had nine days left in his sentence at the time.

50.     While detained at CJC, Mr. Wrobel, who was diabetic, struggled to receive adequate medical care. He repeatedly told his family and friends, as well as staff at CJC, that CJC staff were not providing him correct or adequate treatment for his diabetes, and he was afraid he was going to die at the jail.

51.     On or about December 25, 2023, at 9:00 p.m., Mr. Wrobel reported to LPN Michelle Avalos that he had received the wrong insulin earlier, resulting in low blood sugar. He was given glucose pills and food.

52.     At or around 10:00 p.m., Mr. Wrobel began vomiting and having diarrhea.

53.     Mr. Wrobel continued to vomit and have diarrhea through approximately 10:55 p.m. He also had pain and cramping in his stomach and was extremely pale and sweating excessively.

54.     EPSO Deputy Brandon Garcia took Mr. Wrobel to the medical unit where he began to vomit uncontrollably.

55.    LPN Avalos administered Zofran (a nausea and vomiting prevention medication) and Imodium (diarrhea treatment), but she returned him to his cell around 11:20 p.m. despite the fact that he remained panicked and obviously ill.

56.    Deputy Garcia asked EPSO Deputy Joel Watkins, the deputy assigned to the medical unit, if Mr. Wrobel could be kept in the medical unit for observation, but he was informed that due to limited housing in medical, it was not possible.

57.    At approximately 11:30 p.m., Mr. Wrobel again had uncontrollable vomiting and diarrhea and he was screaming, "help me." As Deputy Garcia approached him, Mr. Wrobel fell out of bed and started screaming in agony. Mr. Wrobel told him that he "shit" himself and couldn't control his bodily fluids. His jumpsuit and bedding were covered in vomiting.

58.    Mr. Wrobel started rocking back and forth on the floor yelling that he needed medical attention. A medical emergency was called by Deputy Garcia, and Mr. Wrobel was transported to obtain medical assistance.

59.    Because the medical unit was at full capacity, Mr. Wrobel was placed in a special detentions cell in the transfer corridor and checked on by deputies.

60.    The deputies observed that Mr. Wrobel appeared to be having a medical emergency. He was repeatedly vomiting, lying on the floor and moaning with pain, and making gagging noises. Mr. Wrobel told them he was in pain and couldn't breathe.

61.    Apparently believing that Mr. Wrobel was experiencing methadone withdrawal because he had been vomiting after his December 25th dose, LPN Avalos, on direction of charge nurse RN Nicole Normore, administered another dose of methadone at approximately 12:00 or 12:30 a.m. on December 26, 2023.

62.    Methadone is a synthetic opioid that is used to treat opioid use disorder, such as

symptoms of withdrawal. Side effects of methadone are similar to those of other opioids. Individuals experiencing methadone overdose may have symptoms that include vomiting and drowsiness, sleepiness, disorientation, sedation, unresponsiveness, trouble staying awake, and unconsciousness.

63.    All medical professionals are aware that a methadone overdose may be fatal if untreated or treated inadequately.

64.    Mr. Wrobel was also taking duloxetine and nortriptyline, antidepressants that are also used for neuropathic pain, which commonly occurs in diabetics and which Mr. Wrobel was struggling to control. On or about November 6, 2023, Dr. George Santini placed Mr. Wrobel on 60 mg of duloxetine twice a day and 50 mg of nortriptyline twice a day, despite knowing that Mr. Wrobel was also taking daily doses of methadone.

65.    Both duloxetine and nortriptyline can have significantly dangerous interactions with each other and with methadone, including but not limited to potentially fatal changes to the electrical activity of the heart (QT prolongation). Dr. Santini prescribed significantly high doses of both of these medications while simultaneously being aware of the risks of interactions between these medications and with methadone.

66.    Given the known risks of nortriptyline and duloxetine causing QT prolongation, Dr. Santini knew that Mr. Wrobel needed to be closely monitored, including by regular ECGs. On information and belief, neither Dr. Santini nor any other medical provider at CJC ever ordered an ECG (electrocardiogram) for Mr. Wrobel after he started taking nortriptyline, duloxetine, and methadone together.

67.    Given the known risks of nortriptyline and duloxetine in combination with methadone, Dr. Santini knew that he needed to instruct nursing staff to be strictly adherent to the

medication schedule, and to never give Mr. Wrobel additional doses of methadone within a 24-hour period. On information and belief, Dr. Santini failed to give nursing staff this instruction.

68.    On December 25, 2025, Mr. Wrobel took his second doses of duloxetine and nortriptyline at approximately 10:00 p.m.

69.    At approximately 3:15 a.m., Mr. Wrobel was found unresponsive and wearing vomit-soaked clothing by EPSO Deputy Eric Mendez and RN Nicole Normore.

70.    Deputy Mendez and EMT Omar Stovall lifted Mr. Wrobel into a wheelchair and brought him back into the medical unit. Deputy Mendez described Mr. Wrobel as appearing to be "in a comatose state" because his mouth and eyes were wide open and he didn't appear to blink.

71.    In the presence of EMT Stovall and EMT Karen Palacios, RN Normore gave Mr. Wrobel one dose of Narcan (naloxone) in his nostril. Narcan is a medication used to immediately counteract the effects of opioids.

72.    The Narcan revived Mr. Wrobel, although he continued to vomit.

73.    At this point, RN Normore, EMT Stovall, and EMT Palacios knew without a doubt that Mr. Wrobel was suffering from a methadone overdose because Narcan is only effective to counteract the effects of opioids.

74.    RN Normore, EMT Stovall, and EMT Palacios all knew that a patient that has been revived by a dose of Narcan must be carefully monitored to see if an additional dose (or doses) of Narcan will be required. RN Normore, EMT Stovall, and EMT Palacios all knew that an overdosing patient faces a substantial risk of death if additional doses of Narcan are required and not administered.

75.    Despite knowing that Mr. Wrobel faced a substantial risk of death if he required

but was not given additional doses of Narcan, with RN Normore's approval, Mr. Wrobel was again moved out of the medical unit due to the lack of space.

76. Mr. Wrobel was placed into a cell that did not have regular monitoring of inmates by either deputies or inmates.

77. At approximately 7:40 a.m., Mr. Wrobel was found dead by EPSO Deputy David Dehaan who was escorting medical staff performing medication pass. Deputy Dehaan opened Mr. Wrobel's cell and asked him if he wanted his medications; when he did not respond, Deputy Dehaan entered the cell and observed that Mr. Wrobel was unresponsive, his skin color was not normal, and he was cold to the touch. Vomit was noted by the bed and in the toilet in the cell.

**Mr. Wrobel's death was caused by an overdose of methadone, and the reckless failure to take him to the hospital or adequately monitor him after the administration of Narcan.**

78. The El Paso County Coroner performed an autopsy and determined that Mr. Wrobel died due to cardiopulmonary arrest and encephalopathy in the setting of polypharmacy, vomiting and diarrhea, diabetes mellitus, and cardiac scarring.

79. Because Narcan has a very short half-life compared to methadone's half-life (the half-life measures how long it takes before a drug is fully eliminated from the body), a known and obvious issue with treating methadone overdoses with Narcan is that a dose of Narcan will initially effectively treat someone overdosing on methadone, but then once the Narcan wears off, the individual may go back into overdose.

80. This is exactly what happened to Mr. Wrobel. By giving Mr. Wrobel a second dose of methadone before 24 hours had elapsed since his initial dose on December 25, 2023, and given Mr. Wrobel's vulnerability to major interactions between the methadone and other medications he was taking, the second dose of methadone administered by LPN Avalos, on

direction of charge nurse RN Nicole Normore, caused Mr. Wrobel to overdose and/or suffer adverse drug reactions.

81.    While the single dose of Narcan revived Mr. Wrobel by initially acting on the methadone, the Narcan was eliminated from (metabolized by) Mr. Wrobel's body before the methadone. Since the methadone remained in Mr. Wrobel's system and continued affecting him after he had metabolized the Narcan, and RN Normore did not administer a second dose nor adequately and continuously monitor Mr. Wrobel for further signs of overdose, Mr. Wrobel eventually succumbed to the toxic effects of the methadone.

82.    By not closely monitoring Mr. Wrobel to be able to administer further doses of Narcan despite knowing that Mr. Wrobel was suffering from methadone overdose—knowledge gained since Mr. Wrobel initially became responsive when given Narcan after he had been unresponsive—or immediately sending Mr. Wrobel to the hospital, RN Normore recklessly failed to provide Mr. Wrobel with adequate medical care and caused Mr. Wrobel's death.

83.    It would have been obvious to a lay person, not to mention a trained medical provider like RN Normore, that a patient must receive emergency medical care straight away once Narcan is administered. Indeed, the information insert in Narcan packages explicitly directs that the person administrating Narcan must "[s]eek emergency medical assistance as soon as possible after administering the first dose." The package insert further states to "[a]dminister additional doses of NARCAN Nasal Spray, using a new nasal spray with each dose, if the patient does not respond or responds and then relapses into respiratory depression, [and] additional doses of NARCAN Nasal Spray may be given every 2 to 3 minutes until emergency medical assistance arrives." The administrator must "keep patient under continued surveillance and administer repeat doses of naloxone using a new nasal spray with each dose, as necessary, while

awaiting emergency medical assistance." The label also warns that "NARCAN Nasal Spray is not a substitute for emergency medical care."[2]

84.    Likewise, EMTs Stovall and Palacios recklessly failed to intervene in RN Normore's decision not to adequately monitor Mr. Wrobel for continuing symptoms of methadone overdose after the initial Narcan administration and/or not to send Mr. Wrobel to the hospital, despite their knowledge that emergency care and close monitoring is necessary after an initial dose of Narcan to ensure adequate treatment of methadone overdose.

85.    RN Normore and LPN Avalos also knew that administering a second dose of methadone in close temporal proximity to when another dose was administered was dangerous and could potentially be fatal, especially given that Mr. Wrobel was taking significant doses of other medications that could have similar adverse effects as methadone and/or adversely interact in known, dangerous ways. Despite this knowledge, neither nurse took appropriate steps to ensure that Mr. Wrobel was safe after administering additional methadone, but rather sent him back to his cell, which was outside of the medical unit and was unmonitored by medical staff.

86.    Given how obviously ill Mr. Wrobel was and continued to be throughout the night of December 25th and the early morning of December 26th, LPN Avalos, RN Normore, EMT Stovall, and EMT Palacios were aware that additional testing, monitoring, and treatment needed to occur, yet each failed to ensure that Mr. Wrobel obtained these necessary care either via further work-up and monitoring in the medical unit or transfer to a hospital. Indeed, none of these medical providers even contracted a higher-level provider to discuss Mr. Wrobel's condition.

---

[2] *Naloxone Labeling- Package Insert 03/27/2023*, FDA, FDA-Approved Dugs Database, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/208411s007lbl.pdf.

87.    Dr. Santini, in addition to his liability as Medical Director of CJC based on conduct described below, is liable for deliberate indifference to Mr. Wrobel's serious medical needs by prescribing Mr. Wrobel high dosages of both duloxetine and nortriptyline. Despite his knowledge that Mr. Wrobel was taking daily methadone and that a substantial risk of danger and even death existed due to interactions between these medications and methadone, Dr. Santini recklessly failed to adequately monitor risks like QT prolongation by ordering regular ECGs.

88.    Dr. Santini further recklessly failed to adequately ensure that medical staff at CJC, including but not limited to RN Normore, LPN Avalos, EMT Stovall, and EMT Palacios, did not take any actions to increase the risk of adverse effects caused by these drug interactions—such as giving Mr. Wrobel two methadone doses in one day.

89.    Had any of these Defendants and appropriately responded to Mr. Wrobel's serious and obvious medical needs, he more likely than not would have survived.

90.    None of the Individual Defendants nor any other Wellpath, El Paso County, or CJC employee received any discipline or follow-up counseling or training related to the death of Mr. Wrobel, demonstrating the determination by the Entity Defendants that their agents acted in conformance with the training, policies, and standard operating procedures of each of the Entity Defendants.

91.    El Paso County, Dr. Santini, and Wellpath trained CJC medical staff, including the Individual Defendants, to conduct themselves in the manner that they did with respect to Mr. Wrobel, and these Defendants' actions—and Mr. Wrobel's death—were pursuant to the training, customs, practices, and policies of El Paso County, Wellpath, and Dr. Santini.

**El Paso County is directly liable for deliberate indifference after contracting with Wellpath in 2019 despite knowledge of Wellpath's provision of constitutionally deficient care.**

92.    At all times relevant to the facts of Mr. Wrobel's death as described herein, Defendant El Paso County contracted with Wellpath to provide medical care and services to inmates at CJC, as well as medical personnel.

93.    El Paso County's use of contracted medical care is customary in the detentions industry and part of a nationwide pattern in the use of private, for-profit, medical companies in providing care in jails, a practice motivated by a desire to cut costs, resulting in exceedingly frequent shoddy and deliberately indifferent care provided to jail detainees.

94.    The use of private companies, and the respective contracts shifting various costs between counties and private companies, encourages cost reduction at the expense of quality medical care, and discourages proper oversight. The for-profit motive contributes significantly to practices, policies, and training that result in deliberately indifferent provision of medical care to serious medical needs of detainee/patients, by disincentivizing jails and their medical providers from providing the necessary staff and resources to evaluate illness such as by staffing and encouraging contract of higher-level providers, prescribe medications, oversee effective treatment, and send inmates to hospitals.

95.    From 2016 to 2018, jails relying on one of the five leading jail healthcare contractors, including Wellpath and its predecessor companies, had higher death rates than facilities where medical services were run by government agencies. Privately run health care providers had death rates that were 18 to 58 percent higher than those of public providers.

96.    At the time of the events alleged herein, Wellpath was a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates. Amid

a focus on cost containment, profitability, and massive corporate growth, the company has provided substandard medical care that has caused avoidable deaths and other serious negative outcomes at detention facilities throughout the country.

97.     Wellpath had previously operated in Colorado and nationwide as CCS. In the request for proposal submitted by Wellpath for the contract at the CJC, Wellpath admitted that it previously had done business as CCS. Prior to operating in Colorado and nationwide as CCS, Wellpath operated as CHC. CFMG (California Forensic Medical Group) also became part of Wellpath in 2018.

98.     The rebranding to Wellpath was undertaken to escape the names associated with these companies that have a long, sordid history of providing constitutionally deficient care to inmates – but the company's deficient care remained the same, no matter how many times the name is changed.

99.     Wellpath repeatedly relied on inexperienced workers, offered minimal training, understaffed facilities including by not having higher-level providers work adequate on-site hours, and discouraging transfers to hospitals.

100.    Across the country, providers acting on behalf of Wellpath consistently failed to diagnose and monitor life-threatening illnesses and chronic diseases, denied urgent transfers to higher-level care, and failed to diagnose or treat serious psychiatric disorders. Wellpath consistently allowed common conditions in jails to become fatal.

101.    In 2019, El Paso County agreed to pay Wellpath $8.6 million for Wellpath to provide medical services at CJC starting in 2020; Wellpath's bid was more than $7 million lower than the other bid received.

102.    El Paso County had previously used Wellpath (then named "CHC" then "CCS")

as CJC's medical services provider from approximately 2013 through 2017.

103.    At approximately the time El Paso County signed its contract with Wellpath in 2019, Wellpath was facing over 1400 lawsuits nationally and had been sued for providing inadequate medical care in over 70 deaths.

104.    One county that terminated its contract after less than two years with one of Wellpath's predecessor companies called the company's performance morally reprehensible. Another said one Wellpath-predecessor-company's failures had turned its jail into a sinking submarine. Former employees have resigned from Wellpath's predecessor companies because working for the companies put their licenses at risk. One employee stated that CCS was only concerned about the almighty dollar and would cut costs at any cost to patient care and safety.

105.    Defendant El Paso County knew that Wellpath, and its predecessor companies, customarily provided inadequate, deliberately indifferent medical care to inmates and severely understaffed the facilities that they operated within. Despite this knowledge, Defendant El Paso County made the affirmative decision in 2019 to re-contract and continue contracting with Wellpath to provide health care at the El Paso County CJC, with the foreseeable result that inmates would continue to receive unconstitutionally inadequate medical care.

106.    Prior El Paso County Sheriff Bill Elder testified in 2021 that he had concerns about Defendant Wellpath's care due to "for-profit business model" having "systemic' problems." He further testified that providing adequate medical staffing was a consistent problem under Defendant Wellpath. In August 2020, then-Sheriff Elder was quoted in Denver's 5280 magazine, about for-profit jail medical contractors like Defendant Wellpath as saying "They're in it for the money, … They will do necessary operations, but if they can increase their net, they'll do it…. What happens if a nursing job comes open and they don't fill it immediately,

or ever? Those dollars go directly to the bottom line."

107.    El Paso County oversaw the implementation of the contract with Wellpath. El Paso County was aware of the contractual provisions that caused the customarily deficient medical care, training, and policies at the CJC, but did nothing to address these issues. El Paso County continued to allow Wellpath to violate the constitutional rights of inmates pursuant to the explicit terms of its contract with Wellpath.

108.    El Paso County is liable for the selection and ongoing retention of Wellpath to provide medical services at CJC despite such knowledge of its longstanding and widespread custom, policies, and practices of providing constitutionally inadequate medical care to jail inmates at correctional and detention facilities with whom it has contracted.

109.    The contract between El Paso County and Wellpath included financial incentives for providing less, and deficient, care. Part of the contract between El Paso County and Wellpath was an aggregate cap program aimed at reducing hospital visits and pharmacy costs for inmates. This directly led to a financial incentive to, for example, not transfer inmates, like Mr. Wrobel, to the hospital despite the obvious and emergent need to do so after the administration of the Narcan or to provide him with ECG monitoring prior to that. The contract also provided obviously deficient staffing levels for higher level providers, meaning that there were not enough hours of on-site higher-level medical staff to provide safe oversight and care of all CJC inmates.

110.    Accordingly, given what it knew of Wellpath's history of constitutionally inadequate medical care in correctional and detention facilities, El Paso County was deliberately indifferent to the health and safety of CJC inmates including Mr. Wrobel by re-contracting with Wellpath in 2019 through 2023.

**Entity Defendants' and Dr. Santini's customs, policies, training, and/or practices of deliberate indifference to inmates' serious medical needs caused Mr. Wrobel's death and the violation of his constitutional rights.**

111.    Defendants El Paso County, Wellpath, and Dr. Santini created, fostered, maintained, and tolerated an environment and culture responsible for the deliberate indifference to medical needs of detainees at CJC.

112.    CJC medical staff and Wellpath medical staff at other facilities engaged in a persistent practice of using deliberate indifference, and the officials responsible for supervision, training, and creating and enforcing policies, including Dr Santini, consistently failed to adequately train and supervise medical providers, including by failing to discipline individuals who have provided inadequate and constitutionally deficient medical care. This deliberately indifferent custom, policy, and/or practice has led CJC medical providers on a regular basis to be deliberately indifferent to the serious medical needs of inmates.

113.    El Paso County's, Wellpath's and Dr. Santini's deliberately indifferent policy, custom, and/or practice of condoning, encouraging, tolerating, rewarding and ratifying deliberate indifference resulted in a custom or culture of CJC medical providers being deliberately indifferent because Entity Defendants and Dr. Santini explicitly or implicitly communicated to CJC medical staff, including Individual Defendants, that such deliberate indifference was authorized and, indeed, expected, and when used would be defended by the supervisory and municipal apparatus of El Paso County and Wellpath.

114.    The approval and defense by Wellpath and El Paso County of deliberate indifference sent a clear and unequivocal message to those employees—it trained them—that such deliberate indifference was acceptable, consistent with policy, and was approved practice, causing the use of such deliberate indifference to be likely or even inevitable in the future.

115.    The Individual Defendants were deliberately indifferent toward Mr. Wrobel pursuant to El Paso County's, Wellpath's, and Dr. Santini's customs, policies, and/or practices of unconstitutional care; the failure of the El Paso County, Wellpath, and Dr. Santini to adequately train and supervise medical providers regarding providing adequate medical care at CJC and other detention facilities; and the failure of El Paso County, Wellpath, and Dr. Santini to appropriately discipline medical providers who engaged in deliberate indifference.

116.    Defendants El Paso County, Wellpath, and Dr. Santini maintained constitutionally deficient training, policies, customs, and practices and neglected to adequately train and supervise their CJC medical staff with respect to the proper procedures for the evaluation and treatment of CJC inmates' serious medical needs, including but not limited to treatment of inmates with opiate use disorder with methadone and treatment of opioid overdoses with the use of Narcan.

117.    It was well known by the Entity Defendants and Dr. Santini prior to Mr. Wrobel's death that there was a widespread pattern and practice of deliberately indifferent medical care at CJC, as well as other facilities at which Wellpath provided medical services.

118.    As shown by the similar actions of multiple Wellpath employees and Wellpath's failure to discipline any Individual Defendants, Wellpath and CJC had a custom or practice of dangerous administration of methadone and Narcan, including by not closely monitoring or sending an inmate to the hospital after administering Narcan.

119.    Likewise, Wellpath and Dr. Santini did not adequately train medical providers at CJC in administering methadone and Narcan—including the requirement that emergency care is immediately sought after administration and close monitoring is critical—despite the obvious need to do so given the known frequency with which inmates at CJC used methadone and

25

suffered opiate/opioid overdoses.

120.    The Individual Defendants' violation of Mr. Wrobel's Eighth Amendment right to be free from deliberate indifference, standing alone, is sufficient evidence of Wellpath's, El Paso County's, and Dr. Santini's custom, policy, or practice of providing unlawful medical care because all Individual Defendants (save Dr. Santini) acted in essentially the same unconstitutional manner, each adhering to what he or she based upon training knew to be standard operating procedure, policy, and customary practice. The number of individuals involved—all of whom took active part and/or failed to intervene to prevent colleagues' use of deliberate indifference—makes clear that their actions were caused by El Paso County's, Wellpath's, and Dr. Santini's unconstitutional training, customs, policies, and practices.

121.    The Entity Defendants' and Dr. Santini's policies, training, practices, and/or customs of deliberate indifference and their lack of adequate training, supervision, and discipline regarding meeting the serious medical needs of those in custody at CJC is further evidenced by an extensive history, including that described below, of deliberate indifference by El Paso County and/or Wellpath medical providers.

### A. Inadequate Medical Care at CJC

122.    Even when Wellpath was not the contracted medical services provider at CJC, inmates received constitutionally deficient care.

123.    For instance, in October 2019, Susan Cespedes died while incarcerated at CJC due to deliberate indifference. In the weeks leading up to her death, Ms. Cespedes repeatedly requested medical assistance, to no avail. Staff at the jail was aware that Ms. Cespedes suffered from diabetes, kidney disease, high blood pressure, and other medical issues that could be deadly if untreated. Staff exhibited deliberate indifference to Ms. Cespedes by ignoring several red flags

in the days before her death, including dangerously low blood pressure, struggling to eat, nausea, vomiting, and sharp pains in her right side. In response to these complaints, medical staff gave her only ibuprofen. By the time she was taken to the hospital, she had gone into shock and her organs had failed.

124.    In August 2019, Joseph Lee Wrobelez was denied his prescription medication for 22 days, leading the court to continue his sentencing pending a competency evaluation ordered because Mr. Wrobelez reported delusional thoughts during the weeks he went without his medication. Recognizing the conclusion that this was a frequent occurrence at the jail, the court blamed CJC for the delay, stating, "[t]his has been a common problem." The court was referencing, among other cases, that of James Papol, who had been diagnosed with schizophrenia and previously acquitted of criminal charges by reason of insanity, yet went eight days at CJC without receiving his antipsychotic medication, thereby delaying his competency evaluations.

125.    In June 2019, Terry West died at CJC after staff witnessed and ignored warning signs of a medical emergency, including complaints of chest pain and vomiting blood and Mr. West's calls for me help. In the six days he was detained at CJC before his death from a stomach ulcer hemorrhage, Mr. West repeatedly complained about his health problems to CJC nurses. Approximately 30 minutes before his death and after staff knew he had been vomiting blood and screaming in pain, Mr. West was brought into the medical section of CJC; although he was acting erratically, rather than provide immediate medical assistance or call for a hospital transfer, medical staff allowed EPSO officers to restrain Mr. West with shackles and handcuffs. Mr. West died almost immediately after being restrained. Mr. West's death was caused by the deliberate indifference to his medical needs by CJC staff.

126.    Also in June 2019, CJC inmate Holly Peck attempted to kill herself by hanging.

After Ms. Peck was discovered, CJC staff did not provide adequate medical assistance in attempting to resuscitate her, and she did not regain a pulse until paramedics arrived; she was then taken to the hospital, where she died five days later due to deliberate indifference.

127.    On August 1, 2018, multiple ESPO officers at CJC used excessive and unreasonable force against Deramus Lemuel, who had just arrived at the jail from the hospital where he had been treated for suspected methamphetamine toxicity. On his arrival at CJC, deputies and nurses observed obvious signs of Mr. Lemuel's altered condition due to methamphetamine intoxication. Despite his obvious impairment, deputies shoved Mr. Lemuel to the ground and piled on top of him, among other uses of force, rendering him unconscious. Despite the fact that Mr. Lemuel's health and safety were obviously at severe risk during the incident, CJC deputies and nurses indefensibly waited over four minutes after Mr. Lemuel fell unconscious before attempting CPR or any other life-saving actions. Mr. Lemuel never regained consciousness and died on August 14, 2018, due to the use of unconstitutional excessive force and deliberate indifference by CJC staff. El Paso County paid $1.5 million to settle a lawsuit based on Mr. Lemuel's death, and CJC's medical services provider at the time paid a confidential amount to settle claims against it and its employees.

128.    In February 2018, Don Woodson's leg was partially amputated when a dog bite he had suffered during arrest festered with gangrene while he was in custody at CJC. CJC and medical staff's deliberate indifference to his serious medical needs included failure to timely treat his leg.

129.    In October 2017, CJC inmate Madelyn Taylor Hemphill was forced to give birth on her own in an isolation cell after CJC staff refused her medical assistance despite her cries for help. Ms. Hemphill's baby was born into a toilet, where she inhaled water and stopped breathing;

although the baby was resuscitated, she developed an e-coli infection and was in the hospital for three months. CJC medical staff was determined to have acted in accordance with CJC policy, practice, and training despite the obviously deliberate indifferent care Ms. Hemphill and her baby received

130.    In September 2017, 40-year-old Eliezer Tirado-Ortiz was killed in CJC, while suffering a known drug-related medical crisis. After CJC officers used overwhelming and unjustified force against him, including physical restraint by six officers, a nurse and the involved officers failed to immediately begin resuscitation attempts after Mr. Tirado-Ortiz became obviously unresponsive. The CJC nurses did not take charge of the situation, leading to a delay in calling an ambulance and providing medical treatment. Mr. Tirado-Ortiz's death was likely preventable had CJC staff not been deliberately indifferent to his medical needs.

131.    Also in 2017, medical staff at CJC committed at least two botched emergency responses; in one instance, staff delayed putting a neck brace on an inmate and calling an ambulance, and in the other instance, the CJC nurse who responded to an inmate's medical emergency struggled to set up the oxygen tank and perform CPR.

132.    In December 2017, the National Commission on Correctional Health Care, which provides accrediting to correctional facilities, placed CJC on probation, based on an assessment that CJC failed seven of 39 "essential standards," including emergency services. CJC also failed three "important" standards, including clinical performance enhancement, which evaluates the appropriateness of services delivered by patient care clinicians and nursing assessment protocols. The NCCHC probation was lifted on April 22, 2018, but noted that "clinical performance enhancement" remained subpar.

133.    An audit of CJC by the NCCHC in the fall of 2018 resulted in CJC's accreditation

being put on probation again after it found numerous problems with medical services, including a backlog of medical requests that left more than 300 inmates without prompt access to medical care.

### B. Wellpath's Provision of Inadequate Care at CJC

134.    Specific further examples of constitutionally deficient care to inmates at CJC when Wellpath was the contracted medical services provider include but are not limited to the incidents below, which show that Individual Defendants' failure to provide timely and adequate medical care to Mr. Wrobel was part of a custom of deliberate indifference by El Paso County and Wellpath.

135.    Twenty-four inmates died at CJC from medical conditions from 2020 through 2023 when Wellpath was the medical services provider, many due to El Paso County's and Wellpath's deliberate indifference to the inmates' medical needs.

136.    Four inmates died by suicide from 2020 through 2023, including Dezeree Archuleta.

137.    In June 2022, 18-year-old Dezeree Archuleta died from suicide at El Paso County Jail after repeated worsening of her mental health condition was recklessly not responded to and Wellpath staff repeatedly refused to send her for obviously needed higher level care. Ms. Archuleta had a well-documented history of mental health issues, including major depressive disorder and post-traumatic stress disorder. Despite ongoing, obvious and well-known signs of suicidality, Ms. Archuleta was taken off suicide watch. Over the course of her incarceration, Ms. Archuleta's situation deteriorated, and she relayed suicidal ideation, visual hallucinations, self-harm, and requested medications to help with her depression. Wellpath staff merely responded that she should try to take her mind off things. Even after she was found naked and punching

herself in the face, this known worsening of her condition did not prompt Wellpath to transfer her to a hospital or advanced level psychiatric care. Ms. Archuleta asked Wellpath mental health staff to keep her on suicide watch as she was continuing to have self-harming thoughts, but on June 8th, staff removed Ms. Archuleta from watch. The next day, Ms. Archuleta was noted to have a blunted affect and change in her presentation -- she told staff she was suicidal, but again was not transferred or provided any higher-level mental health care. She was callously told to simply "use her coping skills." Ms. Archuleta was found dead hanging from a vent grate by a torn strip of clothing in her single-cell later that day. El Paso County paid $1 million to partially settle a lawsuit based on Ms. Archuleta's death; claims against Wellpath and its employees remain pending.

138.    In 2023, CJC and Wellpath staff recklessly denied Stuart McLaney, who had leukemia, his previously prescribed daily chemotherapy pill for over four months, despite the obvious necessity of the medication and Mr. McLaney's repeated requests. The denial of the medication caused a significant relapse of Mr. McLaney's cancer and physical pain, as well as a shortened life expectancy. Mr. McLaney's injuries were directly caused by the deliberate indifference of CJC and Wellpath staff.

139.    In September 2023, Jamin Robertson died at CJC due to deliberate indifference hours after returning from the hospital. Mr. Robertson smeared his own blood and feces in his jail cell hours before his death, but jail staff ignored his symptoms. Hours after his first reported symptoms of bleeding and defecating himself, he was found dead in his jail cell. Despite monitoring that was supposed to occur every fifteen minutes, several checks were done hastily by jail staff or just skipped entirely during the hours Mr. Robertson was dying in his cell. Mr. Robertson died of internal bleeding due to a gastrointestinal hemorrhage.

140.     On December 11, 2022, 24-year-old Savannah Poppell was found barely responsive in her cell at CJC surrounded by copious amounts of vomit that looked like coffee-grounds – a telltale sign of internal bleeding. The dark vomit was on the floor, the walls, her bed, and all over her face. Ms. Poppell was withdrawing from opiates, which all medical staff know frequently involves significant vomiting and needs to be properly managed as it is potentially fatal. She was also a Type 1 diabetic and her insulin was totally unmanaged by Wellpath medical staff even in the very dangerous context of repeated vomiting of blood. Near the time of her death she was extremely hyperglycemic. The coroner concluded Ms. Poppell experienced such violent and prolonged vomiting from substance abuse withdrawal that she tore her esophagus, suffered a fatal upper gastrointestinal hemorrhage and bled to death at the jail—all due to Wellpath medical staff's deliberate indifference to her serious medical needs. El Paso County paid $1.5 million to partially settle a lawsuit based on Ms. Poppell's death; claims against Wellpath and its employees are pending.

141.     Felicia Hudson died at the CJC on October 15, 2022, due to deliberate indifference by CJC staff. She had a clinical history of chronic obstructive pulmonary disease and chronic respiratory failure, requiring supplemental oxygen. During her intake screening on October 13, 2022, she reported to medical staff that she was supposed to use an oxygen concentrator at nighttime. She also reported that for the past three days, she had a productive cough and shortness of breath. Despite telling a nurse about her chronic conditions and serious symptoms, CJC staff recklessly failed to provide any oxygen or escalate to a higher-level provider. She was found unresponsive in her cell at the CJC just two days later.

142.     Daniel Murray died of alcohol related conditions and withdrawal seizures while incarcerated at CJC in July of 2022. While he was in "chem dep," which is how the jail staff

often refer to the medical's Chemical Dependency plans for withdrawal, he had a sharp mental decline and was ranting incoherently and hallucinating. Mr. Murray supposedly "refused" medication, although he was not competent then to do so given his mental state. Despite obvious inability to consensually refuse medication, and his declining condition, Wellpath medical staff treated Mr. Murray as "refusing" and just being "in a mood," and refused to provide him any treatment. Deputies noticed shallow breathing and Mr. Murray told staff that he was having a seizure. Mr. Murray's alcohol withdrawal needs were recklessly under-assessed, and then medical staff ignored his obvious change in condition and active decompensation until he died. El Paso County paid $1.875 million to partially settle a lawsuit based on Mr. Murray's death; claims against Wellpath and Wellpath employees remain pending.

143.    On July 3, 2022, Cassandra Ramirez died from drug related issues at CJC. That day, she had been "chem depping pretty aggressively throughout the day and she was needing a new jumpsuit and blankets," which means that Ms. Ramirez's symptoms had caused her to urinate and defecate on herself. Wellpath medical staff recklessly refused to address these serious obvious symptoms, leaving Ms. Ramirez to die near midnight on July 3, 2022.

144.    Cristo Canett died a gruesome, painful, and entirely preventable death while incarcerated at CJC. Mr. Canett took himself to the emergency room because of his severe back and flank pain. He was recklessly arrested at the hospital after he was triaged and waiting to be taken back to see the nurses and doctor. When Mr. Canett arrived at CJC, without having been medically evaluated at the ER, his pain had grown worse, spreading to his abdomen and right shoulder. Mr. Canett told Wellpath nurses at the jail about his new emergency symptoms of abdominal and shoulder pain, asking to see a nurse and doctor. Mr. Canett's pain became so bad he needed a wheelchair. He was pale, clammy, had labored breathing, shortness of breath, and

was in obvious severe pain and medical distress. Deputies called the jail medical unit for help several times, but Wellpath staff did nothing in response. They did not send him to the hospital where they knew he had tried to go the day before when he was arrested. They did not even call a doctor to report these abnormal symptoms. No nurse or doctor ever assessed or treated Mr. Canett at the jail. Mr. Canett was suffering from a duodenal ulcer, which finally perforated early in the morning on April 26, 2022, causing him to internally bleed to death on the floor of his cell. Wellpath and its staff's deliberate indifference to his medical needs caused his death. El Paso County paid $2.5 million to partially settle a lawsuit based on Mr. Canett's death; claims against Wellpath and Wellpath employees remain pending.

145.    On March 16, 2022, Laura Gibbs told CJC deputies that she was not feeling well and having panic attacks. Deputies told Wellpath medical staff and the Chemical Dependency nurse said she would see her. Later that day, deputies again told medical that Ms. Gibbs was not feeling well, but medical refused to come. Later again on the 16th, deputies called medical a third time and she was finally seen. Her problems continued into the morning of March 17th. At approximately 9:00 a.m., when the nurses came to her unit to pass out medications, deputies asked them to see Ms. Gibbs. She told medical that she was withdrawing from heroin and was experiencing nausea, diarrhea, the shakes, and was hot and cold. Medical staff merely responded that they would make note of her problems and would come back to see her. Medical did not come back or provide any medication to address Ms. Gibbs' worsening condition even though all jail staff know these withdrawal symptoms can be fatal in drug users if not treated. Predictably, later that day at 2:17 p.m. on March 17th, Ms. Gibbs was found unresponsive and declared dead shortly thereafter—a death that would not have occurred but for Wellpath's employees' deliberate indifference.

146.    CJC officials failed to screen, care plan, and provide necessary medications and treatment to 32-year-old inmate Princeton Jackson, who was paralyzed from a prior spinal cord injury with extremely limited use of his lower extremities. To urinate, Mr. Jackson required a catheter and lubricant; to have a bowel movement, he required an enema, all of which was obvious and understood by CJC staff. Nevertheless, they forced Mr. Jackson to ration catheters, leaving him without any means to relieve his bladder for extremely long periods of time. Adding injury to injury, the limited supply of catheters Mr. Jackson was given were the wrong size, causing extreme pain every time he inserted or removed a wrong-sized catheter, as well as discharge of chunks of tissue and blood. CJC staff also refused to allow Mr. Jackson access to cheap and readily available enema supplies. Instead, they forced Mr. Jackson to digitally remove his own feces. Despite numerous requests for medical care and to be seen by a provider, he was effectively ignored. During his 72-day detention, Mr. Jackson fell victim to severe staffing issues at the CJC, often going hours without being able to urinate, developing infections, constipation, diarrhea, and fecal impaction. He also was denied his prescription, gabapentin, which he needed to alleviate severe nerve pain and duloxetine, for his depression and PTSD caused by his prior accident. Even one of the Defendant El Paso County medical staff was frustrated enough with the understaffing at CJC that he documented on Mr. Jackson's medical charts, in connection with one of Mr. Jackson's missed dosages on March 6, 2022, that the "medication was not given due to critical staffing, only having one person to pass meds for the entire jail." Due to CJC staff's deliberate indifference, Mr. Jackson suffered significant injury and pain.

147.    On February 14, 2022, 32-year-old Sean Williams was incarcerated at CJC when deputies saw him to be "physically unwell." He was naked and emaciated, not responding to verbal commands, and there were feces scattered on the floor. He struggled to sit up and had to

be helped into a wheelchair. Deputies decided that he needed to go to medical immediately. Deputies told the Wellpath charge nurse that Williams had not eaten or drank much (if anything) for days. The charge nurse said that he was "experiencing an episode of psychosis," but did not evaluate him. Deputies decided to keep him in medical until he was actually evaluated. Over the next hours deputies repeatedly found Mr. William still sitting in medical, waiting to be evaluated. On one such occasion, a deputy noted that "[m]ultiple medical staff walked over Inmate Williams. He made sounds of distress while he laid on the floor." Deputies returned him to his wheelchair. When deputies asked medical about him, they said "just so you know, he's psychotic." Later that same day, deputies saw on the video feed of the medical unit that Mr. Williams was back on the floor with "medical staff standing at the charge desk approximately 6 feet from Inmate Williams" with "no one evaluating" him." Mr. Williams became progressively worse while medical staff ignored him. Medical told deputies on multiple occasions that his medical crisis was not real and "behavioral," meaning "a choice that someone engages in" rather than an actual "medical condition." On one of the times, he slipped out of his wheelchair, too weak to hold himself up, the charge nurse said "[h]e's fine. It's behavioral. Just leave him there. If anything, it's better than him sliding in and out of the wheelchair." Deputies returned to medical to help him and found him with mucus and spit all over his face – they demanded that nurses take his vitals. EMT Patterson was not able to get vitals and left to get different equipment. Due to Wellpath staff's deliberate indifference, Mr. Williams died on February 15, 2022, of lymphocytic encephalitis, only 22 days after being booked into the jail on charges of trespass and shoplifting.

148.    In 2022, Marcus Ryines attempted to kill himself after nine months in custody at CJC in which his over 60 complaints regarding his mental health, as well as his symptoms of

severe mental health issues, were ignored. Due to CJC staff's deliberate indifference, Mr. Ryines attempted suicide and was also left handcuffed to the floor of his jail cell, naked, for more than two hours after his suicide attempt rather than taken to the hospital, leading him to suffer immense distress.

149.    From November 2021 through February 2022, Alexandro Duran, who is paraplegic and uses a wheelchair for mobility, was treated with deliberate indifference to his obvious medical needs and accommodations by CJC staff, leading Mr. Duran to develop dangerous pressure sores that became infected. CJC staff, including Dr. Santini, provided obviously inadequate medical care to treat the pressures sores and recklessly and with deliberate indifference ignored Mr. Duran's repeated requests to be sent to a hospital to obtain proper medical care until after he became septic and at danger of death or serious bodily harm. Since February 2022, Mr. Duran has been in and out of hospitals and nursing homes for treatment and care relating to the pressure sores and attendant life-threatening infections.

150.    On September 27, 2021, William Johnson suffered a fatal seizure in CJC after spending a month pleading to receive the prescription medications that he brought to the jail with his primary care physician's current orders and letters warning of the dangers of withdrawal if his medications were not provided. Wellpath staff conducted a cursory intake assessment, and then abruptly discontinued four of Mr. Johnson's necessary mental health and anti-seizure prescriptions with no medical basis, and without consulting with his prescribing physician. Without his medications, Mr. Johnson decompensated, became severely anxious, could not sleep, lost touch with reality, and suffered a complete mental breakdown. Instead of helping him, he was punitively placed in solitary confinement where he continued not to receive his medications, including those for seizure prevention. Although Mr. Johnson had a known, major unexplained

change in mental status and was severely incapacitated, he was not sent to the hospital. He spent the last week of his life disoriented, alone, and begging for medications, before dying of a seizure in solitary confinement. Like Mr. Wrobel, the coroner's office determined that polypharmacy contributed to Mr. Johnson's death; he was given over a dozen prescription medications over one month in jail.

151.    Adison Reed was booked into the El Paso County Jail on September 3, 2021. Wellpath and EPSO staff were aware that Mr. Reed was diabetic based on a previous incarceration but deprived him of necessary diabetic care and treatment. During his five days in jail, Mr. Reed's blood sugar was at obviously dangerously high levels. By September 8th, Mr. Reed was in extreme diabetic ketoacidosis, a life-threatening condition that results from a lack of insulin. He was finally transported to the hospital, and died 19 days later, on September 27, 2021. Wellpath and EPSO were deliberately indifferent in Mr. Reed's intake screening and care planning. Staff then allowed his medical condition to devolve to the point of extreme diabetic ketoacidosis as part of their pattern of refusing to respond to obviously critical changes in medical condition until the person is dead.

152.    In 2014, CJC detainee Philippa McCully suffered unconstitutional treatment at the hands of CJC staff. Without warning or provocation, while Ms. McCully was defenseless and facing the back wall of a cell, one deputy violently yanked Ms. McCully's legs out from under her, while another deputy slammed her upper body and head to the ground. The EPSO employees' conduct resulted in severe injuries to Ms. McCully, including but not limited to a fractured left knee, left knee hyperextension with bone contusion, left anterior cruciate ligament (ACL) avulsion tear, torn left posterior cruciate ligament (PCL), left posterior joint capsular tear, extensive, deep bruising on the fronts and backs of her legs and blunt trauma to her face, head

38

and upper body. Immediately after the officers severely injured her, Ms. McCully screamed out in pain that they had broken her leg. Even so, the officers who were present did not ensure that she received obviously necessary medical treatment. She then suffered excruciating, untreated pain for the rest of the five days that she remained in custody at CJC. Despite her obvious pain and inability to walk properly on her injured leg, she was never even given over-the-counter pain relief medication let alone more significant and necessary medical intervention, constituting deliberate indifference to serious medical needs. In 2018, El Paso County and CCS settled a lawsuit based on the incident for a total of $800,000.

153.    In June 2013, an EPSO deputy used excessive force in attacking CJC inmate Robert Montoya without any provocation, striking Mr. Montoya in the face, pushing him into a wall, beating him and sitting on him. Not only was Mr. Montoya seriously injured, CJC staff then acted with deliberate indifference to the serious medical injuries they themselves had caused by refusing him medical treatment for his injuries. El Paso County settled a civil rights lawsuit based on this incident in 2015.

154.    On January 7, 2013, Christopher Spencer nearly died after being shot in the chest during an attempted robbery in Colorado Springs. Mr. Spencer was transferred from a hospital to CJC on February 15, 2013. Because of the gunshot wounds, Mr. Spencer's circulation was compromised, and his feet began to swell. Gangrene ultimately caused Mr. Spencer's feet and toes to visibly fester with sores and rendered him unable to walk without debilitating pain. CJC staff refused to obtain medical care for Mr. Spencer despite repeated requests for help, and it was not until Mr. Spencer left CJC on April 16, 2013, that he received proper medical care. By then, however, his toes and part of his left foot had to be amputated due to CJC staff's deliberate indifference to Mr. Spencer's obvious and serious medical needs.

### C. *Wellpath Provision of Inadequate Care Nationally*

155.    In addition to the CJC-specific incidents described above, because Wellpath was a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates at correctional facilities at which it contracts, there is an abundance of examples nationwide establishing that the Wellpath and the entities that employed it had policies, customs, and practices demonstrating deliberate indifference to the medical needs and constitutional rights of inmates.

156.    Specifically, Wellpath has a dangerous policy/custom/practice of recklessly failing or delaying to provide care by higher-level providers, inadequately staffing higher-level providers on-site, and discouraging on-site providers from even seeking phone consultations from higher-level providers. Similarly, Wellpath maintains dangerous policies, customs, and/or practices of recklessly discouraging staff from timely sending inmates off-site for necessary medical care, including emergent care.

157.    Wellpath maintains unconstitutional policies and customs that are deliberately indifferent to inmates' serious medical needs, which have left a trail of deaths and serious injuries throughout the country. These policies and customs include a pattern of that described in the preceding paragraph as well as:

- recklessly failing to properly screen and plan for medical and mental health needs on intake, and recklessly failing to timely respond to serious changes in condition;

- recklessly failing to hospitalize inmates with obviously serious medical needs whose needs staff know cannot be met within the jail; and

- recklessly presuming an inmate is malingering or faking their serious symptoms and withholding treatment on that basis.

158.    These local and nationwide unconstitutional policies and practices, often implemented to maximize profits at the expense of adequate medical care, have caused substantial neglect and abuse by the company toward inmates and prisoners.

159.    Indeed, a CCS medical director at Richland County's Alvin S. Glenn Detention Center testified in a 2014 deposition that the company made it clear that employees who "run up the tab" wouldn't be around very long. He described pressure from both the county and CCS to limit emergency room transfers because of the "severe expense" involved.

160.    A 2020 Reuters investigation of large jails found that patients at institutions using Wellpath and other private providers died at higher rates than at jails with public health care. The investigation found that from 2016 to 2018, for every 10,000 inmates in Wellpath's care, 16 died; in publicly run jails, that rate was 13 per 10,000.[3]

161.    An anonymous jail nurse who worked for CCS at the Brown County jail in Green Bay, Wisconsin, told a reporter in 2017 that CCS discouraged sending inmates to the hospital. This was despite the fact that there was no IV therapy in the jail, which was critical for many withdrawal patients. She said that in order to send a withdrawal patient to the hospital, the inmate would "need to be at the point where their vital signs were dropping, their internal organs were starting to become compromised."[4]

162.    A 2019 report by CNN (on Wellpath's predecessor CCS) concluded that "internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50

---

[3] Susie Neilson, *Its patients are 'literally a captive market.' Is this California health care giant failing them?*, SAN FRANCISCO CHRONICLE (July 25, 2023), https://www.sfchronicle.com/california/article/wellpath-health-care-jails-17917489.php.

[4] Julia Lurie, *Go to Jail. Die from Drug Withdrawal. Welcome to the Criminal Justice System*, MOTHER JONES (February 2017), https://www.motherjones.com/politics/2017/02/opioid-withdrawal-jail-deaths/.

current and former employees, and scathing correspondence from government clients show that amid a focus on 'cost containment' and massive corporate growth, [CCS] has provided substandard care that has led to deaths and other serious outcomes that could have been avoided." The report found that "[a]cross the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases. CCS employees have denied urgent emergency room transfers. They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal."[5]

163.    In 2023, US. senators, including Senator Elizabeth Warren, sent a letter to Wellpath to express "deep concern" of reports that Wellpath was providing inadequate health care in prisons and jails across the United States. The letter stated that since its creation (of its processor companies), Wellpath had been the target of multiple federal investigations and lawsuits, and federal investigations, media reports, and reports by incarcerated individuals had revealed apparent deficiencies in Wellpath's care including those that had caused inmates' deaths. Serious complaints against Wellpath mentioned by letter included delayed care and denial of care, including Wellpath staff failing to respond to urgent care needs requiring emergency room transfer; inadequate staffing as revealed by DOJ investigations in 2015, 2018, and 2021, among other investigations; and negligent care and failure to follow doctors' treatment plans. The senators' letter noted that "Wellpath's payment structure incentivize[d] cutting costs by minimizing the number of healthcare services provided and opting to provide less resource-intensive services," including the incentivizing of Wellpath to reduce the number of transfer to

---

[5] Blake Ellis and Melanie Hicken, *A CNN investigation exposes preventable deaths and dangerous care in jails and prisons across the country*, CNN (June 2016), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

hospitals and to employ fewer staff members. The letter concluded by requesting specific

information and data from Wellpath.[6] The senators who have questioned the company have

asked Wellpath specifically about its procedures to treat opioid withdrawal. Upon information

and belief, Wellpath has never provided substantive responses.

164.    Numerous examples of Wellpath's substandard and unconstitutional care exist.

The following is simply a selection among literally hundreds of examples of horrifying deaths

and refusals of care further evincing Wellpath's unconstitutional policies and practices, under its

previous names and continuing by the newly reorganized entity.

165.    In May 2023, Niki Capaci died at age 40 while incarcerated at Orange County Jail

in New York due to the deliberate indifference of Wellpath and Wellpath employees. Ms. Capaci

had been in the jail for approximately three days when she was found unresponsive in her cell.

Ms. Capaci had been exhibiting symptoms of severe opioid withdrawal, but she was intolerant to

buprenorphine, a common medication to treat opioid use disorders. She was given the drug

anyway, then became extremely ill with uncontrollable vomiting and diarrhea. Besides being

given anti-nausea and anti-diarrheal medication and being checked by jail staff in her cell

sporadically, Ms. Capaci was largely left alone in her cell without any medical intervention by

jail staff. Like Mr. Wrobel, jail medical staff provided a reckless lack of care in the amount of

drugs she was prescribed and the effects on her body, leading to her death.

166.    Twenty-seven-year-old Carl Martin died in April 2022 due to the deliberate

indifference of Wellpath and other staff after spending approximately seven days in Adams

County Detention Facility. On arrival, Mr. Marin exhibited symptoms of severe alcohol

---

[6] December 18, 2023, United States Senate Letter to Wellpath and H.I.G Capital, available at
https://www.warren.senate.gov/imo/media/doc/2023.12.18%20Wellpath%20letter1.pdf.

withdrawal syndrome. During his seven-day detention at ACDF, Mr. Martin was never examined by a physician or higher-level provider like a physician assistant or nurse practitioner, and his condition continued to obviously deteriorate. None of jail medical providers ever even contacted a higher-level provider for guidance, treatment, or support, and instead allowed the alcohol withdrawal protocol on which Mr. Martin was placed upon admission to lapse, despite the fact that Mr. Martin continued to exhibit very alarming and noticeable symptoms. Mr. Martin stopped drinking sufficient amounts of water as his condition worsened; despite the known risk of dehydration with severe alcohol withdrawal, the nurses did not give him an IV to ensure hydration or take any other steps to monitor or address his dehydration. Many of medical providers fabricated their records or at the very least made substantial errors in their charting regarding if and when Mr. Martin received medication for withdrawal and assessments. Thus, Mr. Martin arrived at ACDF alert and oriented and became progressively confused and bewildered, suffering obvious hallucinations and gradually losing touch with all reality. Eventually, on April 5, 2022, after painfully suffering physically and emotionally for seven days in plain view of ACDF staff, Mr. Martin died on the floor of his cell. If any of the named medical provider defendants or named deputy defendants had initiated an appropriate medical intervention on behalf of Mr. Martin, he likely would be alive today. Their willful and deliberate indifference to Mr. Martin's serious medical needs directly led to his torturous, easily preventable, and unjustifiable death.

167.    On March 10, 2022, Lindsay Otto was arrested and taken to the Platte Valley Medical Center (PVMC) to be medically cleared before being booked at Adams County Detention Facility to serve a DUI sentence. Ms. Otto was diagnosed with jaundice as a complication of alcohol abuse and had a blood alcohol content of .351. Despite these severe

conditions, she was sent to ACDF and housed in the Medical Unit. Ms. Otto died on March 28, 2022, from alcohol-related complications. She was 29 years old when she died due to deliberate indifference by ACDF and Wellpath medical staff.

168.     Wellpath's deliberate indifference caused the in-custody death of Paul Bulthouse, age 39, in April 2019. Mr. Bulthouse died at the Muskegon County Jail after he suffered 15 seizures over a period of less than four hours due to alcohol and benzodiazepine detoxification. Mr. Bulthouse's severe symptoms, including hallucinations as well as seizures, were deliberately ignored and untreated by Wellpath staff. As with Mr. Wrobel, Wellpath staff failed to send Mr. Bulthouse to a higher-level provider despite the obviously severe symptoms of detoxification, and Mr. Bulthouse died alone in his cell.

169.     On March 28, 2019, John Kowalski died from complications of opiate withdrawal due to Jefferson County Jail (JCJ) and Wellpath staff's deliberate indifference to his serious medical needs, while he was a pre-trial detainee at the JCJ. While in custody, Mr. Kowalski, suffering from opiate withdrawal, passed out and had a seizure in the shower. Mr. Kowalski's conditions were communicated to JCJ staff and Wellpath medical personnel responsible for caring for Kowalski. However, JCJ and Wellpath staff did not provide adequate medical care nor life-preserving checkups on his condition. As a result, he became gravely ill and went into cardiac arrest. He died a week later at the hospital.

170.     58-year-old Randall Johnson died in the Shasta County Jail in 2018 due to Wellpath's and its staff's deliberate indifference to his known medical needs. Mr. Johnson had attempted to kill himself by overdosing on methamphetamine. He was sent to the jail instead of the hospital. At the jail, he was speaking incoherently, screaming in pain, and vomiting. He had elevated vital signs. A Wellpath nurse falsified his medical intake form to cover up that he was

experiencing a medical emergency. Despite their knowledge of his methamphetamine intoxication and obvious need for emergency medical attention, Wellpath staff at the jail admitted Mr. Johnson to the jail rather than allow him to go to the hospital. Over the next 36 hours, Mr. Johnson's condition deteriorated until he died, with several Wellpath nurses refusing to send him to the hospital despite his obvious and serious need to be sent out for emergent care. A lawsuit based on Mr. Johnson's death was settled for $12.75 million, with Wellpath and one of its employees paying $11.1 million due to their deliberate indifference.

171.    In January 2018, Wellpath providers were deliberately indifferent to the serious medical needs of Kathleen Norman, causing her death. Ms. Norman was suffering the effects of alcohol detoxification while in custody at the Yamhill County Jail in Oregon. When she was admitted to the jail, Wellpath staff were aware of her condition and placed her in a medical cell on a detoxification protocol. Despite supposed medical monitoring, Wellpath staff allowed Ms. Norman to fall off her bed and lie face-down on the ground, alone, for an extended period of time, resulting in her death.

172.    In 2018, James Jarvis, a 60-year-old man, was incarcerated at the Mesa County Jail with current prescription medications for hypertension. Mr. Jarvis was denied his prescribed medication by CCS medical staff, and he became seriously ill in about a week. After days of vomiting, dizziness, and stumbling when he tried to walk, Mr. Jarvis complained to a nurse and was just told to put in a kite. His condition continued to deteriorate in front of the nurses' eyes, so much so that he could no longer move without assistance. This was captured on video and reported to staff repeatedly. But for many days, multiple nurses on multiple shifts, refused to send him to a hospital or even call a doctor. An LPN saw Mr. Jarvis five days after he submitted a kite, by which time he could not walk and the left side of his face felt rubbery. Yet this LPN

46

sent him back to his cell without performing any assessment and without contacting a higher-level nurse or doctor. Mr. Jarvis had suffered a stroke, and despite his obvious presentation of the classic symptomology of such a serious medical emergency, he was forced to wait for a scheduled appointment with an NP before an ambulance was finally called. This delay caused permanent injuries.

173.    In April 2017, Denny Lovern died of a heart attack at the Arapahoe County Detention Facility after CCS nursing staff recklessly ignored his obvious emergency symptoms in the days leading up to his death. Despite Mr. Lovern's known history of cardiac issues and his prescription heart medication Plavix, CCS nurses failed to give Mr. Lovern his Plavix because the jail did not have any and they failed to promptly secure a supply. CCS nurses then ignored Mr. Lovern's reports of chest pains, presuming he was malingering, and "treated" this chest pain with an over-the-counter antacid. Despite repeated requests for help, Mr. Lovern's obvious and treatable cardiac emergency went untreated. He was never sent to the hospital, and he died on the floor of his cell. He was 59 years old.

174.    After several in-custody deaths at the San Luis Obispo County Jail, the Department of Justice investigated Wellpath's medical and mental health care. One of these deaths involved a 2017 death of a man who did not get a comprehensive medical screening when he entered custody, did not get any tests or laboratory examinations, and who was not otherwise monitored by staff while having symptoms of a heart attack. Instead, staff improperly gave him high doses of Ibuprofen, a drug the FDA has warned can lead to heart attacks in people with high blood pressure. On the morning of his death, the man complained of left shoulder and arm pain, numbness and tingling, clamminess, and left sided chest pain. Consistent with Wellpath's unconstitutional practices, staff refused his requests to be sent to the hospital, and he died of a

heart attack in the jail.

175.    The DOJ found after concluding its investigation in August 2021 that Wellpath's systemic issues caused constitutional violations at the San Luis Obispo County Jail. Specifically, the DOJ found that "[t]he Jail has failed to provide a medical screening system that ensures adequate diagnosis and treatment of serious medical conditions and continuity of care; has failed to ensure access to care for prisoners who report medical problems; and has failed to deliver an acceptable quality of care in several area." The DOJ further found that the jail "fails to provide constitutionally adequate medical care to prisoners" and that it "does not timely evaluate or treat prisoners who request medical attention."

176.    Eighteen-year-old Marc Moreno died in 2016 in Benton County Jail (Oregon) after CCS medical staff unconstitutionally denied him medical care despite his alarming, emergent symptoms. Mr. Moreno was suffering from a known mental health crisis when he was detained, and he was observed by jail staff not eating or drinking for days. When a CCS nurse at the jail observed him, knowing that he had not had food or drink for four days at that point, she not only failed to contact a provider or send him off-site for emergency treatment, she also did not even take his vital signs. The next day, he was found dead in his cell; he had lost 38 pounds in the 8 days he had been detained. After Mr. Moreno's family sued CCS, a court found that CCS had destroyed thousands of potentially incriminating documents in the case before they could be produced. Wellpath settled the lawsuit for $4.5 million.

177.    Henry Clay Stewart died a preventable death from a perforated ulcer at Hampton Roads Regional Jail in Virginia in 2016 after seeking medical assistance from CCS medical staff for almost a month. He reported abdominal pain, blackouts, and inability to keep down food or water. Despite his persistent, concerning symptoms, CCS medical staff acted with deliberate

indifference to his serious medical needs by refusing to send him off-site for care. A Department of Justice investigation found that there was reasonable cause to believe that the jail failed to provide inmates with constitutionally adequate medical care, citing Mr. Stewart's death, among several other deaths from lack of insufficient medical care, as evidence of its finding. The DOJ found that before Mr. Stewart slowly bled to death, medical staff ignored his complaints because they determined that he had already been seen at the hospital.

178.    Alisant Scott lost her breast to a mastectomy in 2016 after being detained in Oakland County Jail (Michigan), where CCS medical staff denied her obviously necessary evaluation and treatment in response to her complaints of agonizing pain due to a knot in her breast growing to the size of a baseball. Ms. Scott was prescribed a basic antibiotic that medical records show did little to combat a dangerous MRSA infection inside her breast; she pleaded with medical staff for help for two weeks before being forced to undergo the mastectomy, and the unconstitutional delay in adequate care and treatment was likely the reason she lost her breast and suffered weeks of excruciating pain.

179.    Marc Moreno died of died of dehydration in the Benton County Jail in Washington State in 2016 at just 18 years old due to CCS and its staff's deliberate indifference to his medical needs. Marc Moreno entered the jail in a mental health crisis and was put in a "safety cell," a very small, padded isolation cell with no natural light and 24-hour-a-day illumination by overhead lamp. There was no access to water in this isolation cell except through staff. A jail social worker witnessed Mr. Moreno's obvious deterioration – including his playing with his own feces inside the cell – and his failure to eat or drink, so she referred him to CCS staff. Despite knowing that Mr. Moreno had not consumed any fluids or nutrition for at least two days, medical staff waited two days before even responding to the referral. When a CCS nurse finally

did observe Mr. Moreno through his cell window, she saw him lying naked on the floor face down. She took no vital signs. She did not take a urine sample, weigh the young man, or take any other steps to assess the severity of his dehydration. This nurse also looked at a food/fluid log for Mr. Moreno, which did not report any food or fluid intake for an additional two days. Despite observing Mr. Moreno in an obviously deteriorated state, and despite knowing that he had not consumed any fluids for at least four days, this nurse left Mr. Moreno to fend for himself. She did not return. Due to CCS staff's deliberate indifference to his serious medical needs, Mr. Moreno died of dehydration caused by prolonged fluid deprivation, lying naked and face down on the floor of his isolation cell, with feces and trash strewn about him. A lawsuit based on Mr. Moreno's death was settled by CCS for $4.5 million. Wellpath agreed to the settlement after a federal district court imposed a default judgment on finding CCS guilty of destroying crucial evidence consisting of thousands of potentially incriminating emails.

180.    In 2016, 59-year-old Paul Clifton Jr. died in an Illinois jail after a jail sergeant who was about to call an ambulance for him due to his difficulty breathing was told wrongly by CCS employees that his condition had improved and that it was unnecessary to send him out. Even though Mr. Clifton's blood pressure remained dangerously high and he complained of chest pains, CCS staff refused to call an ambulance until he was unresponsive. Mr. Clifton's death was caused by CCS medical staff's deliberate indifference to his obvious and serious medical needs, as well as CCS's policy, custom, and/or practice of not or delaying in obtaining obviously necessary off-site care for inmates with serious medical conditions.

181.    In 2015, Scott Millward died in the Teton County, Wyoming, jail where the medical care was provided by CCS. Mr. Millward was in the throes of a medical crisis from alcohol intoxication and withdrawal and also had persistent and critically high blood pressure.

Despite this crisis and abnormal vital signs, CCS staff ignored abnormal vitals, did not take other required vitals, and did not administer Mr. Millward his required medications or gave him insufficient doses. CCS did not take efforts to send Mr. Millward to the hospital, which was only minutes away. Mr. Millward appeared in court where the judge noted that he did not look well. Staff continued to fail to take his vitals and Mr. Millward finally died in his cell. Mr. Millward's autopsy concluded that he died of cardiovascular disease, including hypertension, and that "lack of antecedent medical care" was a contributing factor in his death. Mr. Millward was basically warehoused by CCS staff; he was not administered needed medication, he was not worked up despite serious symptoms and complaints, and instead he was left to die in his cell.

182.    On March 2, 2015, Jennifer Lobato died as a result of dehydration stemming from opiate withdrawal-related complications while being detained at Jefferson County Jail. Soon after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone, including vomiting profusely. Ms. Lobato's symptoms progressively worsened. JCJ medical staff, including CCS (Wellpath's predecessor company) employees, refused to respond to provide Ms. Lobato with the medical care she needed. As a result of staff's, including CCS employees', deliberate indifference to her medical needs, Ms. Lobato died alone in her cell. Ms. Lobato's estate filed suit against several individual defendants, as well as Jefferson County and CCS. Jefferson County and the deputy defendants settled with Ms. Lobato's estate for $2.5 million prior to trial and claims against the CCS Defendants settled for a confidential amount.

183.    Jeffrey Lillis died at 37 years old at the Arapahoe County Detention Facility (Colorado) on December 14, 2014, as a result of deliberate indifference to his known serious medical needs by, among others, a CCS/CHC/CHM-contracted physician (CCS, CHC, and CHM are all Wellpath predecessor companies). Mr. Lillis died of sepsis and severe bacterial

pneumonia, easily treatable conditions that would not have killed him had he been provided

proper and timely medical attention and treatment. Yet despite learning of the serious nature of

his symptoms, the physician failed to timely order that Mr. Lillis be transported off-site for the

necessary medical evaluations and care, leading (among other actions by jail medical staff) to

Mr. Lillis's death. The state medical board later found that the doctor had acted below generally

accepted standards of practice. A claim against the physician and CCS/CHC/CHM was settled by

CCS/CHC/CHM for a confidential amount.

184.    On December 14, 2014, a Colorado federal jury awarded an over $11 million

dollar verdict against Wellpath predecessor company CHC and other defendants for failing to

provide timely medical care to inmate Ken McGill in Jefferson County who was having a stroke.

Nurses recklessly disregarded Mr. McGill's obvious and serious symptoms as not real, did not

call a doctor, did not send him to a hospital for appropriate care, and instead abandoned Mr.

McGill while in the throes of a stroke for hours. The jury found that this company had a pattern

and practice of not providing timely medical care and allowing nurses to practice outside their

scope in treating inmates, awarding millions of dollars in punitive damages for these deliberately

indifferent customs and policies.

185.    In August of 2014, CHC-related defendants unconstitutionally caused the death of

John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his

obvious and serious medical condition. Much like Mr. Wrobel's case, Mr. Walter's case

involved staff deliberately disregarding his obvious malnourishment and dehydration and

withdrawal related conditions due to the jail's and CHC's denial of the prescription medication

he had been taking before he was detained, and the reckless refusal to transport him to the

hospital for necessary emergency treatment. He died on the floor of his cell, weighing 30 pounds

less than when he was brought to the jail three weeks earlier. CCS and its related entities settled a lawsuit based on Mr. Walter's death for $4.25 million.

186.    In June of 2014, David Stojcevski, 32, died from drug withdrawal symptoms after spending 16 days at Michigan's Macomb County jail. When he was booked for his 30-day sentence, Mr. Stojcevski informed CCS (now Wellpath) staff that he was in the process of treating his drug addiction and that he was taking methadone, benzodiazepines, and other opiate medication. However, jail and Wellpath staff were deliberately indifferent to Mr. Stojcevski's critical need for ongoing medication and care while withdrawing from drugs. Much like Mr. Wrobel's case, staff placed him in a "high observation" cell where they noticed his bizarre behavior indicative of severe withdrawal symptoms but were indifferent to his serious medical needs, including his obvious inability to obtain adequate nutrition or hydration. Mr. Stojcevski lost 44 pounds over 16 days and died on the floor, naked and starving. Mr. Stojcevski's family sued, and Wellpath settled its part of the lawsuit for $1.3 million.

187.    In April of 2014, Thomas Beauford died at Mesa County Detention Facility due to deliberate indifference to his obvious and serious medical needs by CCS (or related companies). Throughout his time at the jail, Mr. Beauford demonstrated clear signs of epilepsy. Because of the failure to provide him adequate care, Mr. Beauford's condition rapidly deteriorated on April 15, 2014, into the morning of April 16, 2014. Though Mr. Beauford's need for immediate medical attention was obvious, at no time was he provided with medical attention or treatment. Alone in his cell, Mr. Beauford ultimately had a series of seizures, fell off his bed, and died with his head jammed underneath his desk. Mr. Beauford's death could have been prevented had jail medical staff and detention personnel provided him (or arranged to provide to him) with prompt and appropriate medical attention and treatment. Judgement was entered against CCS for the

negligent treatment of Mr. Beauford.

188.    An investigation into David Courtney's 2014 death after his detention in Montgomery County Jail, where CCS was the medical care provider, resulted in the Texas Commission on Jail Standards finding that the jail did not meet minimum standards. The conclusion was based in part on the fact that Mr. Courtney received clearly unconstitutional care when CCS waited nearly two months to send him to see a doctor despite at least four notes in his chart about blood in his stool.

189.    On June 3, 2013, Tanya Wrobelez, died alone in a lockdown jail cell at Pueblo County Detention Facility from an alcohol withdrawal related seizure at the age of thirty-six. Ms. Wrobelez's preventable death occurred after she displayed obvious signs of withdrawal, including shaking, nausea, vomiting, sweating, and rapid pulse. Among other acts and omissions of deliberate indifference, jail and CHC (a CCS and Wellpath predecessor) medical staff failed to regularly monitor Ms. Wrobelez's condition, unconscionably delayed giving her medication, provided insufficient medication, failed to transport her to a hospital despite her obvious need for emergent care, and, just minutes before her death, ignored a call for medical to check on her.

190.    In 2013, a multiple plaintiff case was filed against CHC-related companies arising out of three deaths and one near death in the Tulsa County Jail resulting from inadequate medical care and refusals to obtain needed outpatient and emergent services for prisoners (*Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al*., Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.)). One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms. Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport. A third detainee, who had a known history of cardiovascular problems, died after

54

complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied. The incidents were caused by a longstanding policy, practice, or custom at the jail of Wellpath's predecessor companies (CCS, CHC, etc.) refusing to provide higher-level care or to send inmates with emergent needs to the hospital for purely financial purposes.

191.    The death at Tulsa County Jail of Gwendolyn Young in 2013 resulted in an $82 million verdict against CHC after a jury found that it violated Ms. Young's civil rights. Ms. Young, who was in the jail for about five months before her death, frequently complained to CHC staff that she needed to go to a hospital. Two days before her death, she told staff she had been throwing up blood. Minutes before she died, she told a nurse she was having difficulty breathing and asked to go to the hospital. The nurse refused. The jury correctly found that Ms. Young's death was caused by CHC's deliberate indifference to her medical needs. From 2005 to 2014, while CHC was the healthcare provider at Tulsa County Jail, 28 deaths occurred at the jail. CHC's failure to take measures to address known deficiencies in its provision of medical care at the jail before Ms. Young's death contributed to the verdict.

192.    In 2012, CCS medical staff ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell in Wichita County Jail. CCS staff recklessly failed to transport her to the hospital for safe delivery of her child. When delivered, the baby was purplish and in need of medical attention, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

193.    Earl Williams died at the Tulsa County Jail in 2011 after he was known to have gone days without food or water. Mr. Williams' serious and known medical needs were ignored by CHC medical staff because there was an inappropriate "faking or malingering" diagnosis that prevented him from receiving timely hospital care. Expressly concluding that he was faking

paralysis, despite an injury to his head causing partial paralysis, the CHC nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. Before he died, staff threw food at Mr. Williams and put water just outside his reach. Mr. Williams begged for water as he laid on the floor of his cell covered in his own waste. Mr. Williams' death was caused by CHC-related defendants' maintaining a policy, practice, and/or custom of severely limiting the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in deliberate disregard to the known, obvious, and excessive risks to the health and safety of inmates. A lawsuit based on Mr. Williams' death resulted in a pretrial settlement against CHC (a predecessor or Wellpath) and jury verdict against the County in the amount of $10.25 million, which was affirmed on appeal to the Tenth Circuit Court of Appeals, *see Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), and was then settled for $10 million against the County in addition to the separate pretrial settlement paid by CHC.

194.    CHC-related entities at the Tulsa Jails had previously been subject to the following high-level reports of constitutional deficiencies:

      a.    In 2007, the National Commission on Correctional Health Care ("NCCHC") auditors reported serious and systemic deficiencies in the care provided to prisoners by CHC related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner."

      b.    In 2008, the Department of Justice found that the jail medical program, administered by a CHC related entity, was constitutionally deficient in a number of regards. Specifically, among other things, the DOJ found that there were "critical lapses in getting emergency medical care to detainees." DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to

remedy the violations found, "[it] generally did not observe improved conditions at the time of the second tour."

    c.   In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies continued unabated by CHC-related companies despite the abundant notice of the same from NCCHC and DOJ.

    d.   In a 2010 NCCHC audit, NCCHC found deficient care, deficient investigation into deaths, and lack of timely diagnostic and specialty services. Even after this audit, CHC did not follow the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified, despite high-level CHC workers repeatedly bringing to corporate CHC attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions.

    e.   In November 2011, the jail's own retained auditor found the same or substantially similar deficiencies in care.

    f.   In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CHC and related companies and reported that it had found a prevailing attitude among clinic staff of indifference, and nurses were undertrained and there was a high frequency of failure to evaluate patients properly.

195.    In 2009, Charles Holdstock died after the medical staff of a CCS-related company at Oklahoma County Jail ignored lab results that Mr. Holdstock's kidneys were not functioning

properly (and were failing to eliminate the toxic build-up of his heart medication). Instead, jail medical providers acted with deliberate indifference by waiting to take Mr. Holdstock to the hospital despite the alarming test results and related symptoms. Mr. Holdstock was found unresponsive on his cell floor and later died in a hospital emergency room.

### D. Liability of Entity Defendants and Dr. Santini

196.    A common thread in the above cases is that Wellpath and its predecessor companies ignored obvious signs and symptoms to deny inmates access to necessary higher-level care, timely and adequate on-site treatment for urgent issues, and offsite medical care, which is exactly what happened to Mr. Wrobel.

197.    Defendant El Paso County, in contracting with Wellpath to provide medical care at CJC, knew or should have known of Wellpath's significant history and pattern of serious deficiencies in providing medical services and care to detention facility inmates, and refusals by Wellpath to correct such deliberately indifferent policies, practices, and customs. Defendant El Paso County is liable for the selection and years-long retention of Wellpath to provide medical services at CJC despite such knowledge, which demonstrated shocking indifference to the health and safety of CJC inmates in its jail given what it knew to be a history of unconstitutionally inadequate medical care in correctional and detention facilities.

198.    Defendant El Paso County had a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees, which it violated when CJC and Wellpath medical staff did not provide Mr. Wrobel the care that he needed to treat his serious medical condition.

199.    Defendant El Paso County intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party—namely, Wellpath and its

related entities.

200.    Defendant El Paso County is liable for the unconstitutional actions of Defendant Wellpath (including its defective customs, policies, and practices described herein that were the moving force behind the violations of Mr. Wrobel's constitutional rights) and its employees or contractors toward Mr. Wrobel.

201.    Based on the numerous incidents detailed above of constitutionally deficient medical care and treatment provided by one or both of the Entity Defendants, and the absence of accountability and adequate training and supervision, the Entity Defendants and Dr. Santini knew or should have known that CJC medical staff would display deliberate indifference to the serious medical needs of CJC inmates, including but not limited to the failure to obtain timely necessary off-site care for obvious and serious medical conditions.

202.    Further, El Paso County's, Wellpath's, and Dr. Santini's deliberately indifferent policy, custom, and/or practice of failing to discipline, and thereby condoning, encouraging, training, tolerating, rewarding and ratifying such deliberate indifference, has resulted in a custom or culture of inadequate medical care at CJC because these Defendants have explicitly or implicitly communicated to staff, including Individual Defendants, that such lack of care is authorized and, indeed, expected, and when used will be defended by the supervisory and municipal apparatus of El Paso County and/or Wellpath.

203.    El Paso County, Wellpath, and Dr. Santini did not adequately modify their policies or training practices as a result of the many instances of death or serious bodily injury resulting from deliberate indifference at CJC and elsewhere. Such intransigence, especially coupled with the aggressive defense of such tactics after such tragedies have occurred, constitutes a "doubling down" on the part of these Defendants regarding these customs,

practices, and policies, further demonstrating that such conduct is attributable to them as it is how CJC medical providers are trained and expected to behave.

204.    The approval and defense by El Paso County, Wellpath, and Dr. Santini of deliberate indifference by CJC medical staff sends a clear and unequivocal message to those employees—it trains them—that such deliberate indifference is acceptable, consistent with policy, and is approved practice, causing it to be likely or even inevitable in the future.

205.    In light of their knowledge of constitutionally deficient care, the Entity Defendants and Dr. Santini could have and should have changed their policies and/or pursued reasonable methods for training, supervising, and disciplining CJC staff regarding meeting the serious medical needs of CJC inmates, but these Defendants made a conscious and deliberate choice not to do so.[7]

206.    This "policy of inaction" caused additional instances of constitutional violations, including the unconstitutional failure to provide medical care in the case of Mr. Wrobel.

207.    The Entity Defendants' and Dr. Santini's unlawful conduct regarding their deliberate indifference in meeting the serious medical needs of inmates constitutes a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

208.    The Entity Defendants' and Dr. Santini's failure to discipline or counsel any of the Individual Defendants or for their deliberate indifference to Mr. Wrobel's serious medical needs demonstrates that their conduct was carried out pursuant to the customs, policies,

---

[7] El Paso County, by later terminating or not renewing the contract of Wellpath on approximately January 1, 2024, has now taken some steps presumably designed to mitigate the risk of future injury to detainees, while at the same time reaffirming its own conclusion that the medical care provided by Wellpath to jail detainees was, as El Paso County had known for a long time, deficient. Unfortunately, this decision came too late to save Mr. Wrobel's life.

practices, and regiment of training of these Defendants, and that such conduct is customary within El Paso County and/or Wellpath. Had such conduct not been customary and pursuant to approved policy, the Entity Defendants and Dr. Santini would have taken disciplinary or ameliorative action, which they did not.

209.    Because the Entity Defendants and Dr. Santini created, tolerated and, at times, encouraged a custom of deliberate indifference to inmates' serious medical needs and continuously failed, despite the obvious need to do so, to adequately train, discipline, and supervise staff in this area, individuals including Mr. Wrobel have repeatedly been subjected to violations of their constitutional rights.

210.    The Entity Defendants and Dr. Santini knew or should have known that their acts or omissions in failing to provide adequate medical care to meet the serious needs of inmates were substantially certain to cause CJC staff (including Wellpath employees or contractors) to violate individuals' constitutional rights, and the Entity Defendants and Dr. Santini consciously or deliberately chose to deliberately disregard this obvious risk of harm in adhering to their policies and/or customs of, among other things, failing to provide additional or better training and supervision to CJC staff regarding meeting inmates' serious medical needs, including but not limited to the need to obtain timely higher level or off-site care for serious medical conditions and the safe administration of methadone and Narcan.

211.    The Entity Defendants and Dr. Santini were deliberately indifferent to Mr. Wrobel's constitutional rights because they knew that individuals in Mr. Wrobel's position would be at substantial risk of suffering dangerous consequences from, among other things, their failure to adequately train and supervise CJC staff in meeting the serious medical needs of inmates, yet they failed to take adequate action to rectify this deficiency.

212.    The circumstances attendant to Mr. Wrobel's health crisis, including the overdose of methadone and administration of Narcan, are foreseeable in the jail setting, sufficiently foreseeable and recurring as to place the Entity Defendants and Dr. Santini on clear notice that training, policies, and practices must be developed and enforced to avoid the violation of the constitutional rights of detainees who may be incarcerated at CJC.

213.    The need for such training and the probability that the failure to provide such training would cause a CJC inmate like Mr. Wrobel to be seriously injured or to die in the manner that he did was so obvious that Entity Defendants' and Dr. Santini's failure to do so constituted deliberate indifference to Mr. Wrobel's serious medical needs.

214.    Mr. Wrobel's death was the result of longstanding, known systemic deficiencies in the medical care provided to inmates by the Entity Defendants and Dr. Santini, and the Entity Defendants' and Dr. Santini's unconstitutional policies, customs, or practices described above regarding providing medical care to inmates were the moving force and proximate cause of Individual Defendants' violating Mr. Wrobel's constitutional right to be free from deliberate indifference to his serious medical needs.

## VI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**8th Amendment – Cruel and Unusual Punishment Clause**
**Failure to Provide Adequate Medical Care and Treatment**
**(By the Estate of Michael Dennis Wrobel against All Defendants)**

215.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

216.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

217.    At all relevant times, the described conduct of the Individual Defendants was taken within the course and scope of their official duties and employment.

218.    Defendant Wellpath and its agents, at all relevant times, were acting under color of state law, as the functional equivalent of a municipality providing medical care to detainees.

219.    At all relevant times, Mr. Wrobel was a post-trial detainee subject to the protections of the Eighth Amendment to the United States Constitution.

220.    Mr. Wrobel had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs and to receive adequate medical care while in custody of EPSO.

221.    Each Individual Defendant knew or should have known of these clearly established rights at the time of Mr. Wrobel's detention at CJC.

222.    Individual Defendants violated the clearly established constitutional rights of Mr. Wrobel.

223.    Individual Defendants were deliberately indifference to Mr. Wrobel's serious and obvious medical needs.

224.    Mr. Wrobel was in obvious and serious need of medical care and treatment due to the known interactions of the medications he was prescribed by Dr. Santini, including methadone, and due to his emergent medical symptoms on December 25-26, 2023. Individual Defendants failed to provide such medical care, and instead engaged in (or allowed others to engage in) deliberate indifference to his serious medical needs.

225.    Individual Defendants made intentional decisions with respect to the conditions under which Mr. Wrobel was confined. They deliberately and intentionally withheld the medical care he needed.

226.    These conditions put Mr. Wrobel at a substantial risk of suffering serious harm.

227.    Individual Defendants failed to intervene and/or take reasonable available measures to abate the serious and obvious risk to Mr. Wrobel. A reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the Individual Defendants' conduct obvious.

228.    Individual Defendants' conduct was objectively unreasonable. At all times relevant to the allegations in this Complaint, each Individual Defendant knew of and disregarded the excessive risks associated with Mr. Wrobel's serious and life-threatening medical condition.

229.    With deliberate indifference to Mr. Wrobel's constitutional right to adequate medical care for his known serious medical needs, as provided by the Eighth Amendment to the United States Constitution, Individual Defendants knowingly failed to adequately and timely examine, treat, monitor, supervise, and/or obtain emergency care for Mr. Wrobel's medical needs, or to intervene to ameliorate the other defendants' deliberate indifference to the obvious serious medical needs of Mr. Wrobel. They did so despite their knowledge of Mr. Wrobel's serious medical needs, thereby placing him at risk of serious physical harm, including death. Therefore, the Individual Defendants knew or were aware that Mr. Wrobel faced a substantial risk of harm and disregarded this excessive risk by failing to take reasonable measures to reduce it.

230.    By not taking such measures, Individual Defendants caused Mr. Wrobel's injuries and death.

231.    As described with particularity above, the Entity Defendants and Dr. Santini are liable for their deliberately indifferent policies, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the

serious medical needs of detainees like Mr. Wrobel. Entity Defendants have a widespread pattern of deliberately indifferent medical care at CJC and, as to Defendant Wellpath, other correctional facilities at which it provides medical services.

232.    Defendant El Paso County is directly liable for its own deliberately indifferent policies, customs, and practices that were moving forces in Mr. Wrobel's constitutional injury, as well as its own role in setting policy or custom regarding medical care at CJC, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference to CJC detainees' known serious medical needs.

233.    Defendant El Paso County is also liable under the nondelegable duty doctrine for the deliberately indifferent policies, customs, practices, training and supervision of the private companies with which it contracts to provide medical care to CJC detainees, including Wellpath.

234.    As described in detail above, the Entity Defendants' and Dr. Santini's deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving forces in the violation of Mr. Wrobel's constitutional rights.

235.    Entity Defendants and Dr. Santini were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

236.    Entity Defendants' and Dr. Santini failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Wrobel.

237.    Entity Defendants, through policy makers and final delegated decision-makers, and Dr. Santini ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread

culture of ignoring inmates' serious and known medical conditions.

238.    The ratification of the conduct that caused the death of Mr. Wrobel is not alleged as proof that this ratification itself "caused" his death.  Rather, it evidences that the conduct that caused Mr. Wrobel's death was engaged in pursuant to policy, custom, and practice of Entity Defendants; had it been outside of policy, disciplinary or remedial action would have been taken.

239.    Ratification of *previous* instances of deliberate indifference to medical needs, however, was a causal factor in the subsequent instances of deliberate indifference to medical needs regarding Mr. Wrobel, as the employees of the Entity Defendants are trained and taught that such conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

240.    Therefore, Entity Defendants and Dr. Santini set in motion a series of events that they knew would cause an inmate in a similar situation as Mr. Wrobel to be deprived of his constitutional right to adequate medical care for his known serious medical needs.  But for the above acts or omissions of the Entity Defendants and Dr. Santini, Mr. Wrobel would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

241.    The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Mr. Wrobel's constitutional right to receive adequate medical care for his known serious medical needs.

242.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Wrobel's death, the loss Mr. Wrobel's relationships with family and friends, the physical and mental pain Mr. Wrobel suffered before and during his death, the loss of Mr.

Wrobel's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to permanent lost earnings and earnings capacity of Mr. Wrobel.

243.    The herein described acts and inactions were taken by the Individual Defendants and Wellpath in reckless and callous indifference to the federally protected rights of Mr. Wrobel, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Wrobel's and the Estate's constitutionally protected rights.

244.    The intentional actions or inactions of each Defendant as described herein intentionally deprived Mr. Wrobel and the Estate of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**SECOND CLAIM FOR RELIEF**
**Negligence Causing Wrongful Death**
**Colo. Rev. Stat. §§ 13-21-201 *et seq.***
**(By Autumn Lachendro, individually, and C.G.W. against Defendants Liquidating Trust and Individual Defendants)**

245.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

246.    At all times relevant, Wellpath was a private corporation that contracted with El Paso County to provide medical care and health services to inmates at CJC, and Wellpath is not entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

247.    At all times relevant, Individual Defendants were private individuals employed or contracted by Wellpath and thus not entitled to immunity under the CGIA.

248.    At all times relevant, Mr. Wrobel was in the involuntary custody of CJC, and

under the medical responsibility, care, and treatment of Individual Defendants and Wellpath.

249.    Individual Defendants had a duty to provide reasonable medical care and treatment to detainees at CJC, including Mr. Wrobel.

250.    Individual Defendants had a nurse-patient, EMT-patient, or physician-patient relationship with Mr. Wrobel at all relevant times and were acting within the scope of their employment throughout the duration of that relationship.

251.    With respect to their care and treatment of Mr. Wrobel, Individual Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

252.    Wellpath had a duty to exercise reasonable care in providing medical care and treatment to CJC detainees, including Mr. Wrobel, and to exercise reasonable care in the training and supervision of Wellpath's employees.

253.    These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required medical treatment." The provision of adequate medical treatment and humane care is a statutory (as well as constitutional) obligation.

254.    Individual Defendants breached their duty of care to Mr. Wrobel and deviated from the standard of care they owed him when they failed to provide him with reasonably obtainable and necessary medical assessment, monitoring, care, and treatment.

255.    As a direct and proximate result of the Individual Defendants' breach of their duty to provide reasonable care and treatment to Mr. Wrobel, he suffered significant physical and mental pain and suffering and other damages and ultimately died.

256.    Wellpath is sued directly and indirectly for negligence, negligent supervision, and

negligent training of its staff; for failing to ensure the provision of appropriate care in the treatment of Mr. Wrobel; for the acts and omissions of its agents and/or employees; and for the herein described acts by its involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

257.    Wellpath is vicariously liable for the negligent acts and omissions by its agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for negligent failures in training, policies, and practices.

258.    Wellpath is directly liable for breaching its duty to exercise reasonable care in its training and supervision of its employee and agents and CJC staff in a manner that provided CJC detainees with reasonable medical care and treatment.

259.    Wellpath knew or should have known that the lack of adequate supervision and training of its employees and agents and CJC staff was likely to harm CJC detainees in need of medical care, like Mr. Wrobel.

260.    In failing to exercise reasonable care in the training and supervision of its employees and agents and CJC staff, as it relates to their providing reasonable medical care and treatment, Wellpath was negligent and proximately caused Mr. Wrobel's death.

261.    The negligent acts and omissions by the Individual Defendants and Wellpath were a substantial and significant contributing cause of Mr. Wrobel's death, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Mr. Wrobel and Plaintiffs have suffered and are and will suffering.

262.    As a direct and proximate result of the conduct of the Individual Defendants and Wellpath, Mr. Wrobel suffered significant physical and mental pain and suffering and other damages, and ultimately died.

263.    As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

264.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to these Defendants' negligent conduct, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. Wrobel had he lived, and non-economic damages for grief, loss of Mr. Wrobel's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

265.    Individual Defendants' and Wellpath's conduct was attended by circumstances of malice, or willful and wanton conduct, which these Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Mr. Wrobel and Plaintiffs.

266.    Individual Defendants' and Wellpath's conduct as described herein constituted a felonious killing within the meaning of Colorado law.

267.    Individual Defendants' and Wellpath's consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.[8]

---

[8] Given the circumstances of malice and willful and wanton conduct surrounding these Defendants' treatment of Mr. Wrobel, Plaintiffs anticipate seeking exemplary damages for Defendants' negligence once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

## THIRD CLAIM FOR RELIEF
### Negligence Causing Wrongful Death
### Colo. Rev. Stat. §§ 13-21-201 *et seq.*
### (By Autumn Lachendro, individually, and C.G.W. against Defendant El Paso County)

268.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

269.    At all times relevant to this Complaint, El Paso County was responsible for the operation of CJC as a jail within the meaning of Colo. Rev. Stat. § 17-1-102.

270.    Pursuant to Colo. Rev. Stat. § 24-10-106(1)(b), El Paso County is not immune for acts or omissions of EPSO or EPSO employees taken during the operation of CJC.

271.    Plaintiffs provided El Paso County with timely notice of claim, and El Paso County is not entitled to immunity under the CGIA for the negligent conduct of EPSO or its employees that caused the death of Mr. Wrobel.

272.    At all relevant times, the primary purpose of CJC was to safely and effectively confine inmates charged or convicted of crimes for the duration of their pending charges or sentence.

273.    As part of its operation of CJC, El Paso County was responsible for the provision of medical care necessary for health of CJC inmates.

274.    El Paso County had a statutory, constitutional, and common law duty to detain Mr. Wrobel in a safe manner, and to provide him with reasonable medical care and treatment.

275.    El Paso County had a duty to exercise reasonable care in the operation of CJC to ensure that EPSO and its employees exercised and performed the powers, duties, and functions vested in them by law in a manner that reasonably maintained the safety of CJC detainees and provided CJC detainees with reasonable and adequate medical care and treatment.

276.    El Paso County breached its duty of care to Mr. Wrobel and deviated from the

standard of reasonable care it owed him.

277.    El Paso County's conduct as described herein constituted a felonious killing within the meaning of Colorado law.

278.    El Paso County knew or should have known that CJC and Wellpath staff at CJC operated the jail in manner likely to harm CJC detainees by, among other things, creating fostering, maintaining, and tolerating an environment and culture responsible the failure of CJC employees and staff to provide reasonable and adequate medical care and treatment to CJC detainees.

279.    In failing to exercise reasonable care in the operation of CJC, El Paso County was negligent.

280.    El Paso County is sued directly and indirectly for negligence, negligent supervision, and negligent training of its staff; for failing to reasonably ensure the safety of Mr. Wrobel and the provision of appropriate care in the treatment of Mr. Wrobel; for the acts and omissions of its agents and/or employees; and for the herein described acts by its involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

281.    El Paso County is vicariously liable for the negligent acts and omissions by its agents and/or employees and directly liable for negligent failures in training, policies, and practices.

282.    El Paso County is directly liable for breaching its duty to exercise reasonable care in its training and supervision of its employee and agents and CJC staff in a manner that reasonably ensured the safety of CJC detainees and provided CJC detainees with reasonable medical care and treatment.

283.    El Paso County knew or should have known that the lack of adequate supervision and training of its employees and agents and CJC staff was likely to harm CJC detainees like Mr. Wrobel.

284.    In failing to exercise reasonable care in the training and supervision of its employees and agents and CJC staff, as it relates to providing reasonable medical care and treatment, El Paso County was negligent and proximately caused Mr. Wrobel's death.

285.    El Paso County's conduct as described herein constituted a felonious killing within the meaning of Colorado law.

286.    The negligent acts and omissions by El Paso County constituted a substantial and significant contributing cause of Mr. Wrobel's death, and it was reasonably foreseeable that El Paso County's negligence would cause the harm or a similar harm that Mr. Wrobel and Plaintiffs have suffered and are and will suffering.

287.    As a direct and proximate result of the conduct of El Paso County, Mr. Wrobel suffered significant physical and mental pain and suffering and other damages, and ultimately died.

288.    As a result of El Paso County's negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

289.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to these El Paso County's negligent conduct, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. Wrobel had he lived, and non-economic damages for grief, loss of

Mr. Wrobel's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment for the Plaintiffs and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

(a)     Declaratory relief and injunctive relief, as appropriate;

(b)     Economic losses on all claims allowed by law in an amount to be determined at trial;

(c)     Compensatory and consequential damages, including, but not limited to those for past and future losses, damages for emotional distress, loss of enjoyment of life, funeral and related expenses, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the highest lawful rate; and

(g)     Any further relief as justice requires and that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 24th day of December 2025.

KILLMER LANE, LLP

*s/ David A. Lane*

_____

David A. Lane
Liana Orshan
Madison Schaefer
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Fax: (303) 571-1001
dlane@killmerlane.com
lorshan@killmerlane.com
mschaefer@killmerlane.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF REVIEW

This is to certify that undersigned counsel has conferred, pursuant to Colo. Rev. Stat. § 13-20-602, with a medical professional who has expertise in the areas of alleged negligence and deliberate indifference to serious medical needs as set forth in the above Complaint; that this professional has reviewed the known facts, including such records, documents, and other materials relevant to the allegations of negligent acts and omissions; and he has concluded that the filing of these claims do not lack substantial justification within the meaning of Colo. Rev. Stat. § 13-17-102(4).

/s/ *David A. Lane*
David A. Lane